# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 97-3282

_____

Friends of the Boundary Waters
Wilderness; Wilderness Watch; Sawbill
Outfitters, Inc.; Izaak Walton League of
America; The Wilderness Society;
Wilderness Inquiry, Inc.,

        Appellants,

    v.

Michael P. Dombeck, as Chief of the
United States Forest Service; Daniel
Glickman, as Secretary of Agriculture,

        Appellees.

\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*

_____

No. 97-3292

_____

Appeals from the United States
District Court for the District of
Minnesota.

County of St. Louis, County of Lake,
County of Cook, National Association
of Canoe Liveries and Outfitters,
Conservationists with Common Sense,
Ely Outfitters Association, Grand
Marais Gunflint Trail Outfitters
Association, Harvey G. Solberg,

        Appellants,

\*
\*
\*
\*
\*
\*
\*
\*
\*

                              v.                              *
                                                             *
Michael P. Dombeck, Chief of the                             *
U. S. Forest Service; Daniel Glickman,                       *
Secretary of the U. S. Department of                         *
Agriculture,                                                 *
                                                             *
                    Appellees,                               *
                                                             *
Wilderness Inquiry, Inc.; Friends of                         *
the Boundary Waters Wilderness;                              *
Wilderness Watch; Sawbill Trail                              *
Outfitters Association,                                      *
                                                             *
          Intervenors-Appellees.                             *

_____

Submitted: March 11, 1998
Filed: January 7, 1999

_____

Before WOLLMAN and HANSEN, Circuit Judges, and GOLDBERG,[1] Judge.

_____

HANSEN, Circuit Judge.

        This appeal involves two separate cases which were consolidated before the district court.  The plaintiffs in each case sought judicial review of agency action taken by the defendants, the United States Forest Service and the United States Department of Agriculture.  The agency action complained of involves the defendants' interpretation of the statutes governing the Boundary Waters Canoe Area (BWCA) Wilderness,

---

[1]The Honorable Richard W. Goldberg, Judge, United States Court of International Trade, sitting by designation.

which is located in the Superior National Forest along the United States and Canadian border in Minnesota. The challenged statutory interpretations, dealing with visitor and motorboat use restrictions in the BWCA Wilderness, are articulated in the Forest Service's BWCA Wilderness Management Plan and Implementation Schedule of 1993 (the Wilderness Plan). The parties submitted their cases to the district court on cross-motions for summary judgment. In each case, the district court granted summary judgment to the defendants, and the plaintiffs appeal. We affirm in part and reverse in part.

I.

The Wilderness Act of 1964, 16 U.S.C. § 1131-36 (1994), established a national system of preserving and protecting federally held wilderness areas. The BWCA, comprising more than one million acres of land and waterways in the Superior National Forest, was among the initial wilderness areas designated for protection. See 16 U.S.C. § 1132. The BWCA Wilderness contains over one thousand portage-linked lakes, and it is a heavily visited wilderness area, though motorized vehicle use is severely restricted. See State of Minnesota By Alexander v. Block, 660 F.2d 1240, 1245 (8th Cir. 1981), cert. denied, 455 U.S. 1007 (1982). The Wilderness Act of 1964 generally prohibits the use of motorboats and motor vehicles within any designated wilderness, except as required for administration of the area. See 16 U.S.C. § 1133(c); Block, 660 F.2d at 1245. In the same 1964 Act, Congress muddied the waters, so to speak, by including a proviso which permitted the continuance within the BWCA of any already established use of motorboats. See 16 U.S.C. § 1133(d)(5) (1976), repealed by Pub. L. No. 95-495, 92 Stat. 1649, 1650 (1978). These provisions sparked a great deal of local controversy over motorboat use in the BWCA Wilderness. See Block, 660 F.2d at 1246.

In 1978, Congress provided additional guidance by enacting the Boundary Waters Canoe Area Wilderness Act (the BWCA Wilderness Act), Pub. L. No. 95-495,

92 Stat. 1649 (1978). In doing so, it eliminated prior section 1133(d)(5) and in its place legislated a ban on the use of motorboats in the BWCA Wilderness except on particular named lakes, portions of lakes, and rivers. See 92 Stat. at 1650, § 4(c). Congress directed the Secretary to develop and implement entry point quotas to govern and restrict the use of motorboats on those particular lakes listed in section 4(c) where it had legislatively authorized their restricted use. 92 Stat. at 1651, § 4(f). The only specific guidance given to the Secretary concerning these quotas was a statutory cap on motorboat use, which prescribes that motorboat use "shall not exceed the average actual annual motorboat use" during the years 1976 through 1978. Id.

The Department of Agriculture and the Forest Service manage the BWCA Wilderness in accordance with a 1986 Land and Resource Management Plan for the Superior National Forest, amended by the BWCA Wilderness Management Plan and Implementation Schedule of 1993 (the Wilderness Plan), which is the challenged agency action in this suit. The Record of Decision accompanying the Wilderness Plan indicates that the Forest Service established these motorboat quotas after considering the pertinent legislation, Forest Service policy, the needs of the environment, the historic uses of the area, and the recreational needs of the visitors. The Record of Decision explains that the available information indicated that "use levels have begun to strain the wilderness environment" (Record of Decision at 7), and that "[t]he role of the Wilderness Plan is to guide the management of the Wilderness in a manner that maintains its naturalness and protects it for the use of future generations." (Id. at i.) To this end, and to implement the BWCA Wilderness Act, the Wilderness Plan restricts visitor and motorboat use within the BWCA through a quota system, entry point restrictions, special permits for commercial towboats,[2] and a special exemption from the motorboat quota system for homeowners, resort owners, and their guests. These are the provisions at issue.

---

[2]Commercial towboats transport additional canoes, boats, camping supplies, equipment, and persons across the waterways of the BWCA.

One group of plaintiffs consists of several counties, concerned citizens, and outfitters in the BWCA (collectively, the Outfitters). The Outfitters brought suit challenging the Wilderness Plan, claiming the Plan's motorboat quotas, visitor use restrictions, and definition of "guest" unduly limit access to the BWCA Wilderness in violation of the BWCA Wilderness Act; the Administrative Procedure Act (APA), 5 U.S.C. § 706 (1994); the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101-12213 (1994); and the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(2) (1994). The other group of plaintiffs consists of several environmental groups concerned with the BWCA Wilderness (collectively, the Environmentalists). The Environmentalists intervened in the Outfitters' suit and brought a separate challenge to the Wilderness Plan, claiming that its special use permits for towboats and the Plan's grouping of certain listed chains of lakes on which homeowners, resort owners, and guests are exempt from the quota system, allow excessive motorized use in the area in violation of the BWCA Wilderness Act and the APA. In each case, the Forest Service asserted that the restrictions and definitions in the Wilderness Plan comply with all Congressional mandates and are not arbitrary or capricious.

The district court consolidated the two cases, and all parties sought summary judgment. The district court granted summary judgment in favor of the Forest Service and the Department of Agriculture, dismissing the Outfitters' ADA claim (which is not appealed); dismissing the Outfitters' and Environmentalists' APA claims, concluding that the policies expressed in the Wilderness Plan are consistent with and a reasonable interpretation of the BWCA Wilderness Act; and dismissing the Outfitters' NEPA claims, concluding that the Outfitters lacked standing to assert the claims under NEPA. The plaintiffs appeal the dismissal of their APA claims and the Outfitters' NEPA claims.

II.

We review a district court's summary judgment decision de novo, applying the same standards as those employed by the district court. See Phillips v. Taco Bell Corp., 156 F.3d 884, 887 (8th Cir. 1998). Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates the absence of any genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The parties here have all moved for summary judgment, and they agree that no disputed issue of material fact remains. Consequently, we need only determine which party is entitled to judgment as a matter of law.

We bear in mind that when reviewing agency action, we accord "substantial deference to the agency's interpretation of the statutes and regulations it administers." Vue v. INS, 92 F.3d 696, 699 (8th Cir. 1996) (citing Chevron USA, Inc. v. Natural Resources Defense Council, 467 U.S. 837, 842-44 (1984)). We defer to the agency's interpretation "so long as it is not arbitrary, capricious, an abuse of discretion, or otherwise not supported by law." State of Minnesota v. Apfel, 151 F.3d 742, 745 (8th Cir. 1998) (internal quotations omitted); see 5 U.S.C. § 706(2)(a). "Whether an agency's action is arbitrary and capricious depends on whether 'the agency has . . . offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" Mausolf v. Babbitt, 125 F.3d 661, 669 (8th Cir. 1997) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)), cert. denied, 118 S. Ct. 2366 (1998). When reviewing an agency's construction of a statute, the court first considers whether the intent of Congress is clear; if so, the court's inquiry is over, "for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron, 467 U.S. at 842-43. If the statute is silent or ambiguous on the question at issue, the court considers whether the agency interpretation "is based on a permissible construction of the statute." Id. at 843.

## A. Towboat Special Use Permits

The BWCA Wilderness Act directs the Secretary of Agriculture to develop and implement "entry point quotas for use of motorboats within the wilderness portions of the lakes." Pub. L. No. 95-495, 92 Stat. 1651, § 4(f). Congress specifically directed "[t]hat the quota established for any one year shall not exceed the average actual annual motorboat use of the calendar years [1976-78] for each lake." Id. The Wilderness Plan establishes motorboat use quotas and separate special use permits for commercial towboats, providing that "all towboat operations must be authorized by a special use permit," and that "[t]owboat use will be limited to the 1992 levels for numbers of boats, trips, current operators, and specific lakes." (Wilderness Plan at 3-14; Outfitters' App. at 45). Further, the Plan provides that growth in commercial towboat operations beyond these limits will not be permitted. Commercial towboats subject to this special use permit requirement do not count against the quotas established for motorboat use on those lakes where towboats are permitted to operate.

The Environmentalists challenge the Forest Service's adoption of special use permits for commercial towboats. They argue that the plain language of the BWCA Wilderness Act requires towboat use to be taken into account in the motorboat use quotas because the statute makes no explicit exception for commercial towboats. We respectfully disagree. The plain language of the statute requires the Secretary to implement a system of "entry point quotas" for motorboat use and caps the quota at the average use for the years 1976-78, which totaled 10,539 motorboat trips. Within these guideposts, the specific means of implementing motorboat use quotas is left to the discretion of the Secretary. While the Secretary has chosen to implement an independent means of monitoring commercial towboats, the Secretary has not exempted commercial towboats from the overall motorboat use restrictions set forth in the BWCA Wilderness Act. The Wilderness Plan limits commercial towboats to their 1992 levels, which amounts to 1,342 towboat trips per season. Separately, the Plan sets the general motorboat use quota at 7,902 trips. The combined number of

motorized boat trips that the Plan allows (1,342 + 7,902) totals 9,244 trips, which does not exceed the 10,539 motorboat trips cap mandated by the BWCA Wilderness Act. Accordingly, this portion of the Plan is an entirely reasonable and permissible construction of the statute.

Additionally, the Environmentalists contend that the statute does not delegate authority for the agency to issue special use permits to commercial towboats, and therefore, the agency is engaged in an unauthorized regulatory scheme. Contrary to the Environmentalists' assertion, the Plan's creation of special use permits for commercial towboats does not create an unauthorized regulatory scheme. As noted above, the statute delegates to agency discretion the job of implementing the provisions of the BWCA Wilderness Act and the Wilderness Act of 1964, and gives no more specific direction than requiring the implementation of use quotas and capping use levels at the average use during the years 1976-78. The Act does not prescribe the manner or type of entry point regulatory schemes that may be used by the agency to implement the quotas required by the statute. The Forest Service's separate system for monitoring commercial towboat use is born out of a concern that absent a separate system, commercial towboat use would grow and take up an increasingly greater percentage of the available motorboat use quota, leaving fewer quota permits available to visitors. We conclude that this is a reasonable concern and that the Wilderness Plan's implementation of special use permits for commercial towboats is consistent with the statute.

## B. "Guest" Definition

The Outfitters contend that the Wilderness Plan's definition of the term "guest" is too restrictive and is inconsistent with the language of the statute. The statute exempts from the motorboat use quotas any motorboat use by real estate owners and their guests by specially providing "[t]hat on each lake homeowners and their guests and resort owners and their guests on that particular lake shall have access to that

particular lake and their entry shall not be counted in determining such use." Pub. L. No. 95-495, 92 Stat. 1651, § 4(f). Congress did not specifically define who qualifies as a "guest" within the meaning of the statute. The agency's Wilderness Plan provides a definition that limits the term to "[a] person receiving overnight lodging at a home or resort, and who lodges with the consent of a keeper or owner. Customers; i.e., those who purchase a meal, rent a boat, or pay for parking, are not considered guests." (Wilderness Plan, App. F. at F-5; Outfitters' App. at 104.) As such, the term is restricted to overnight lodgers, and all other customers who take a motorboat out on a lake must be counted against the motorboat use and entry point quotas.

The Outfitter plaintiffs contend that the Wilderness Plan's restriction of "guests" to include only overnight visitors is not based on a permissible construction of the statute because it is too specialized a meaning to impose on the common word chosen by Congress. While "the court as well as the agency must give effect to the unambiguously expressed intent of Congress," Chevron, 467 U.S. at 842-843, when a term is ambiguous, the court's task is not to decide the best interpretation of the statute, but whether the agency's interpretation represents a reasonable one. Atlantic Mut. Ins. Co. v. CIR, 118 S. Ct. 1413, 1418 (1998). Congress did not specifically define the term "guest," nor has the Forest Service ever specifically defined the term in prior wilderness management plans. As a purely linguistic matter, the word is common and broad enough to include mere daytime customers, as the Outfitters assert. In fact, the meaning of "guest" can be quite varied given the context in which the word is used, and it is not beyond the scope of common usage of the word to define a resort "guest" as an overnight lodger.

Furthermore, the agency has found that the lack of any specific definition of this word in the past has resulted in an abuse of this exemption from the motorboat use quotas. As the district court pointed out, without the contested definition, resort owners could treat every customer who purchased a candy bar or bait as a resort "guest" to whom they could rent a motorboat for the day without counting against the

quota system.  The Forest Service sought to avoid such abuses by defining only overnight lodgers as guests.  We bear in mind both that the statutory exemption at issue is crafted as an exception to the motorboat use quotas and that these quotas are required by Congress with the intent of protecting the BWCA Wilderness.  See Block, 660 F.2d at 1251 (holding the motor use restrictions of section 4 of the BWCA Wilderness Act are "part of an elaborate system of regulation [Congress] considered necessary to preserve the BWCAW as a wilderness").  Preventing both the repetition of any past or future abuse of the "guest" exemption and the resulting detriment to the goals expressed by Congress, is a reasonable basis on which to impose a more specific and limited definition of "guest."  We conclude that the construction of "guest" provided by the Plan does not thwart congressional intent but is a reasonable attempt to comply with the overall congressional intent of protecting this wilderness area through motorboat use restrictions.

We believe the Outfitters exaggerate the problems that could result from this definition.  They assert that under this restrictive definition, a child could not spend the day fishing with a parent homeowner without a permit.  This argument strains common sense.  In our view, the plain meaning of the statute allows the immediate family members of a homeowner who reside in the home access to the particular lake on which the home is located without even considering the definition of "guest."  Also, the Plan does not restrict the number of motorboats a homeowner may own or use to access the lake.  While the definition restricts a homeowner's day-only guests (including a homeowner's child who does not reside in the home and whose visit does not include an overnight stay) from placing the guest's motorboat in the water without a permit, this inconvenience does not render the agency's interpretation unreasonable or arbitrary.

The Outfitters also contend that the agency's definition of "guest" represents a departure from how the agency has interpreted the word in the past, and thus, it is not entitled to deference.  We disagree.  No prior Forest Service or Department of

Agriculture plans for the BWCA Wilderness have provided a specific definition of the term. Even assuming the new definition runs contrary to some prior agency policy, "the mere fact that an agency interpretation contradicts a prior agency position is not fatal," unless the new position is a sudden and unexpected change in agency policy that can be characterized as arbitrary, capricious, or an abuse of discretion. Smiley v. Citibank (South Dakota) N.A., 517 U.S. 735, 742 (1996); see also Lovilia Coal Co. v. Harvey, 109 F.3d 445, 452 (8th Cir. 1997), cert. denied, 118 S. Ct. 1385 (1998). The Forest Service explained that because it has not provided any definitional guidance in the past, this exemption has become an area of possible abuse of the quota system, and it has now provided this specific definition of "guest" in an attempt to avoid such abuse. Because no definition was specified under prior plans, the current definition cannot be considered as reversing a prior agency policy, and in any event, the new definition is not arbitrary, capricious, or an abuse of agency discretion.

We conclude that the Forest Service's definition of "guests" of homeowners or resort owners as including only overnight lodgers is not an unreasonable interpretation of the statute and that it reasonably promotes the objectives of the statute.

## C. "That Particular Lake"

As noted above, the BWCA Wilderness Act creates the following exemption from motorboat use quotas: "Provided further: That on each lake homeowners and their guests and resort owners and their guests on that particular lake shall have access to that particular lake and their entry shall not be counted in determining such use." Pub. L. No. 95-495, 92 Stat. 1651, § 4(f) (emphasis added). The Wilderness Plan (not the statute) defines the phrase "that particular lake" by providing that certain chains of lakes are to be considered one lake "[f]or the purpose of administering th[e] guest provision." (Wilderness Plan at 3-16; Outfitters' App. at 47.) The Plan states that the Moose Lake Chain, comprised of Moose, Sucker, Newfound, and Birch Lakes, is considered one lake; that the Farm Lake Chain, comprised of White Iron, Farm,

Garden, and South Farm Lakes, is considered one lake; and that the Seagull River and Gull Lake are considered part of Saganaga Lake.

The Environmentalists challenge the agency's decision to consider each chain of lakes as one lake for purposes of exempting property owners and their guests from the motorboat use quotas, contending that this policy impermissibly expands the motorboat use quota exemption. The Environmentalists contend that this statutory exemption from motorboat use quotas gives property owners and their guests quota-free access only to the named lake that abuts their property.

The Forest Service asserts that its interpretation is reasonable because it has always applied this interpretation. Since the BWCA Wilderness Act was passed in 1978, the Forest Service has defined the Moose Lake and Farm Lake chains as one lake each, and has considered the Seagull River and Gull Lake as part of Saganaga Lake in administering the guest provision of section 4(f). The Forest Service reasoned that because these interconnected waterways have a continuously navigable water surface, they are properly considered as one lake. The agency asserts it wanted to avoid interrupting long-standing travel patterns between the lakes within these chains and to continue the Forest Service's historic treatment of these waterways as a single lake. The Forest Service further argues that enforcement of quotas on these connected lakes would be difficult since the property owners and guests can access the connected lakes without leaving the water.

We are not persuaded by the Forest Service's reasons for redefining the plain language of the phrase "that particular lake" as including more than one lake. The premise of the BWCA Wilderness Act of 1978 is that motorboat use is prohibited in the wilderness area, except to the extent that Congress specifically authorized motorboat use on specifically designated lakes, portions of lakes, and rivers. Pub. L. No. 495, 92 Stat. 1650, § 4(c). While a consistent historic interpretation by the agency is entitled to no small amount of deference, it cannot control our interpretation of the

statute when that prior interpretation is at odds with and contrary to the plain language of the statute which the agency is responsible for implementing. When Congress has directly spoken on a matter, and "the intent of Congress is clear, that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron, 467 U.S. at 842-43.

In our view, Congress has spoken in unambiguous terms by using the phrase "that particular lake" in section 4(f) of the BWCA Wilderness Act. We can assume Congress was well aware that many lakes within the BWCA Wilderness are separately named lakes but are interconnected by waterways--one of the unique features of this particular wilderness area. Congress demonstrated this understanding in section 4(c) of the same Act, wherein Congress provided an exception to the general motorboat prohibition by allowing boats with certain sized motors to travel on certain individually named lakes--some of the same lakes with recognized and specific names that the Forest Service now attempts to lump together as one. Congress even prescribed differing motor sizes as appropriate for each specifically named lake, including lakes within a single chain of lakes as now designated by the Forest Service. Thus, when Congress states in section 4(f) that property owners and their guests have access to "that particular lake," it is clear to us from the context that each individually named lake is to be considered a "particular lake." It is not reasonable for the Forest Service to broaden this restrictive phrase by redefining the term "lake" to include several connected but individually named lakes when, within the same section of the Act, Congress has listed named lakes separately and prescribed differing motor sizes for the different specifically named lakes, and indeed has gone so far as to subdivide named lakes for motorboat use purposes.

Given the plain language of the subsection at issue and its context, we are convinced that the homeowner/resort owner and guest exception to the motorboat use quota system should remain as narrow as Congress has written it and that the agency's interpretation is not permissible because it is contrary to the clearly expressed intent of

Congress. Accordingly, the Environmentalist plaintiffs were and are entitled to summary judgment on this issue.

## D. NEPA Standing

The Outfitters claim that the Forest Service's Wilderness Plan for the BWCA Wilderness violates NEPA, see 42 U.S.C. § 4332(2), asserting that the Final Environmental Impact Statement (Final EIS), prepared to aid the agency in analyzing the effects of the Wilderness Plan, was inadequate to satisfy the terms of NEPA. The district court determined that the Outfitters did not have standing to raise their NEPA claims because they complain of potential economic loss, which the district court concluded is not a protected interest under NEPA. The Outfitters contend on appeal that they have standing under the APA to assert that they have been "adversely affected or aggrieved by agency action," see 5 U.S.C. § 702, because their NEPA claims include environmental interests as well as social and economic interests, and their claims challenge the adequacy of the Forest Service's consideration of the economic impact of the Plan.

"The question of standing 'involves both constitutional limitations on federal court jurisdiction and prudential limitations on its exercise.'" Bennett v. Spear, 520 U.S. 154, 117 S. Ct. 1154, 1161 (1997) (quoting Warth v. Seldin, 422 U.S. 490, 498 (1975)); see id. at 1161 (prudential principles of standing are judicially imposed jurisdictional limits which may be altered by Congress); Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (constitutional case and controversy standing requires a party to demonstrate an injury in fact which can be traced to the conduct complained of and is likely to be redressed by a favorable decision). Constitutional standing is not challenged in this case. The relevant prudential principle at play is the zone-of-interests test, which considers "'whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" Bennett, 117 S. Ct. at 1167 (quoting Association

-14-

of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153 (1970)); accord National Credit Union Admin v. First Nat. Bank & Trust, 118 S. Ct. 927, 933 (1998); Lujan v. National Wildlife Fed'n, 497 U.S. 871, 883 (1990). The breadth of this zone-of-interests test varies depending upon the language of the statutory provision at issue. Bennett, 117 S. Ct. at 1161. Recently, in the context of the Endangered Species Act, the Supreme Court refined the zone-of-interests test, stating that "[w]hether a plaintiff's interest is arguably protected by the statute within the meaning of the zone-of-interests test is to be determined not by reference to the overall purpose of the Act in question . . . but by reference to the particular provision of law upon which the plaintiff relies." Id. at 1167 (alterations and quotations omitted).

While the overall purpose of NEPA is to establish "a broad national commitment to protecting and promoting environmental quality," Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 348 (1989), the particular provisions relied on by the Outfitters indicate that the social and economic effects of proposed agency action must also be considered once it is determined that the proposed agency action significantly affects the physical environment. In particular, NEPA directs federal agencies to prepare "a detailed statement" evaluating the environmental impact of a proposed agency action and possible alternatives to the proposed action before the agency takes any action that will "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(2)(C). The regulations implementing NEPA mandate that the term "'[h]uman environment' shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment." 40 C.F.R. § 1508.14. The regulation further explains:

> This means that economic or social effects are not intended by themselves to require preparation of an environmental impact statement. When an environmental impact statement is prepared and economic or social and natural or physical environmental effects are interrelated, then the environmental impact statement will discuss all of these effects on the human environment.

Id.

    Other explicit policies of NEPA on which the Outfitters rely state that its protections are meant to "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings," 42 U.S.C. § 4331(b)(2); to "achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities," id. § 4331(b)(5); and "to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." Id. § 4331(a) (emphasis added). Additionally, the regulations implementing NEPA require an agency to consider the impact of agency action "in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality." 40 C.F.R. § 1508.27(a). Agencies considering significant action are required to examine, inter alia, the "historic, cultural, economic, social, or health [effects of agency action], whether direct, indirect, or cumulative." Id. § 1508.8; see also id. § 1502.16(a),(b).

    The Outfitters claim that they have standing because the Final EIS fails to consider adequately the economic impact on local economies and the Final EIS is based on flawed data or an incomplete analysis of alternative plans. These concerns are explicitly referenced in the provisions of NEPA, which the Forest Service has applied in this case, and its implementing regulations. Pursuant to NEPA, the Forest Service prepared an exhaustive 312-page environmental impact statement, discussing and comparing the range of alternatives available, the affected environment (including the natural ecosystem, the human ecosystem, the economic setting and the social setting), and the environmental consequences of each alternative plan of agency action. In several contexts, the Final EIS discusses the economic setting and the economic implications of the available alternatives. Additionally, the Outfitters assert their own inability to fully enjoy the BWCA Wilderness as a result of the visitor use restrictions,

-16-

a claim which is closely related to the physical environment and which the Final EIS addresses. Thus, we conclude that the Outfitters' claims are all arguably within the zone of interests protected by NEPA, and the Outfitters have prudential standing to assert their NEPA claims.

The defendants assert that the language of Metropolitan Edison Co. v. People Against Nuclear Energy, 460 U.S. 766, 772 (1983), supports their contention that the Outfitters lack standing under NEPA. In a discussion concerning the overall threshold applicability of NEPA, the Supreme Court stated, "NEPA was designed to promote human welfare by alerting governmental actors to the effect of their proposed actions on the physical environment." Id. The Court continued, explaining that "although NEPA states its goals in sweeping terms of human health and welfare, these goals are *ends* that Congress has chosen to pursue by *means* of protecting the physical environment." Id. The defendants especially cling to the following statement of the Court: "If a harm does not have a sufficiently close connection to the physical environment, NEPA does not apply." Id. at 778. The defendants assert that the economic injury claimed by the Outfitters is not closely related to the physical environment, and therefore it does not state an injury within the meaning of NEPA. The reasoning offered by the defendants simply does not apply in the case at hand. We agree that the Court in Metropolitan Edison indicates clearly that despite the broadly stated policies of NEPA, NEPA's protections do not apply unless the harm is closely related to the physical environment. Nevertheless, the present case does not involve the threshold applicability of NEPA as did Metropolitan Edison.

In the present case, the threshold applicability of NEPA is not contested; rather, the agency assumed NEPA applied because the agency action significantly affects the physical environment of the BWCA Wilderness. The agency accordingly prepared an EIS and made factual findings on this basis. We view this case as more akin to Bennett, where the plaintiffs challenged a biological report on grounds that it adversely affected their economic interests under the Endangered Species Act. There was no

question about the applicability of the Act. Instead, the question focused on standing to challenge the report on which the agency relied. The Court stated that to determine whether the plaintiff's economic interest is arguably protected by the statute for purposes of the zone-of-interests test, courts must consider "the particular provision of law upon which the plaintiff relies," not the overall purpose of the Act in question. Bennett, 117 S. Ct. at 1167. The Court held that the Endangered Species Act included an explicit concern for economic consequences, which provided standing for the petitioners. Id. at 1168.

From this analysis, we conclude that although Metropolitan Edison supports the proposition that the sweeping purposes of NEPA do not, as a threshold matter, bring NEPA's procedures into play unless an environmental injury is at stake, Bennett indicates that once those procedures have been invoked, the plaintiffs can assert an injury arising from the agency's failure to take into consideration the particular purposes or provisions of the statute at issue -- in this case, NEPA.

As illustrated above, the Outfitters have asserted particular provisions of NEPA which encompass the claims they set forth in their complaint. We need not consider whether the Outfitters are in fact more concerned with economics than with the welfare of the physical environment. Regardless of their true intent, they have standing to ensure that the agency adequately considers all of the statutorily referenced concerns when balancing the relevant factors in the Final EIS. See Mountain States Legal Found. v. Glickman, 92 F.3d 1228, 1236 (D.C. Cir. 1996) ("NEPA standing is not limited to the pure of heart") (internal quotations omitted). We hold that the Outfitters have standing to challenge the Final EIS on the grounds stated in their complaint because these claims are arguably within the zone of interests protected by NEPA.

E. Merits of NEPA Claims

Having concluded that the Outfitters have standing to bring their NEPA claims, we must determine whether a remand is necessary for resolution of the merits of the NEPA claims. The Outfitters' complaint alleges claims that the Final EIS for the Wilderness Plan failed to consider adequately all available alternatives, the available data, the economic effects of the Plan on the local communities, and the impact of restricting visitor use on their own use of the area. In their opening brief, the Outfitters do not offer argument on the merits of these NEPA claims but seek a remand to allow the district court to determine the merits in the first instance. In their reply brief answering the defendants' arguments that NEPA was complied with and that this court can affirm the district court on any ground supported in the record, the Outfitters advance arguments on the merits of these claims yet still request a remand to the district court for a decision on the merits.

We do review the district court's grant of summary judgment de novo, and we may affirm the grant of summary judgment on any basis supported by the record. Hall v. Lhaco, Inc., 140 F.3d 1190, 1193 (8th Cir. 1998). Because the Outfitters do not assert that additional evidence is necessary to resolve their NEPA claims, we will consider the NEPA claims on their merits rather than remand to the district court. When reviewing the sufficiency of an EIS under NEPA, an appeals court is "in as good a position as the district court to determine on the undisputed facts what could reasonably be demanded of the EIS in issue." County of Suffolk v. Secretary of the Interior, 562 F.2d 1368, 1375 (2d Cir. 1977), cert. denied, 434 U.S. 1064 (1978).

Our role "in reviewing the sufficiency of an agency's consideration of environmental factors is a limited one." Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 555 (1978). We are not free to substitute our judgment for that of the agency. Id. We may set aside an agency decision in this context only if the agency action fails to conform to one of the relevant standards of review articulated in the APA. See 5 U.S.C. § 706 (providing that reviewing court shall hold agency action unlawful if the agency action is arbitrary and

-19-

capricious or an abuse of discretion; in excess of statutory jurisdiction; without observance of procedure required by law; or unsupported by substantial evidence); see also Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 375-76 & n.21 (1989) (applying the arbitrary and capricious standard to an agency determination that an EIS need not be supplemented). When the resolution of the dispute involves primarily issues of fact and analysis of the relevant information "requires a high level of technical expertise, we must defer to the informed discretion of the responsible federal agencies." Marsh, 490 U.S. at 377 (internal quotations omitted).

NEPA requires "that the agency take a 'hard look' at the environmental consequences" of a project before taking a major action. Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc., 462 U.S. 87, 97 (1983). The statute requires a "detailed statement," 42 U.S.C. § 4332(2)(C), "from which a court can determine whether the agency has made a good faith effort to consider the values NEPA seeks to protect." Minnesota Pub. Interest Research Group v. Butz, 541 F.2d 1292, 1299 (8th Cir. 1976), cert. denied, 430 U.S. 922 (1977). "[T]he statement must not merely catalog environmental facts, but also explain fully its course of inquiry, analysis and reasoning." Id. "The role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." Baltimore Gas & Elec., 462 U.S. at 97-98. Adequate agency consideration is evidenced through the EIS's form, content, and preparation. Association of Pub. Agency Customers v. Bonneville Power Admin., 126 F.3d 1158, 1183 (9th Cir. 1997). We need not "fly speck" an EIS for inconsequential or technical deficiencies. Dubois v. United States Dep't of Agric., 102 F.3d 1273, 1287 (1st Cir. 1996), cert. denied, 117 S. Ct. 2510 (1997). Instead, we consider "whether the agency's actual balance of costs and benefits was arbitrary or clearly gave insufficient weight to environmental values." Minnesota Pub. Interest Research Group, 541 F.2d at 1300.

The Outfitters first contend that the Final EIS must be set aside because it failed to include all reasonable alternatives. An EIS must discuss alternatives to the proposed action. 42 U.S.C. § 4332(2)(C)(iii). NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). We review the agency's choice of which alternatives to discuss and the extent to which the EIS must discuss them under the "rule of reason." City of Carmel-By-The-Sea v. United States Dep't of Transp., 123 F.3d 1142, 1155 (9th Cir. 1997). Guided by the "rule of reason," we consider whether the EIS "has been compiled in good faith" and adequately sets forth sufficient information to allow the decision-maker to consider alternatives and make a reasoned decision after balancing the risks of harm to the environment against the benefits of the proposed action. County of Suffolk, 562 F.2d at 1375. Finally, courts have held that while the EIS need not be exhaustive, "[t]he existence of a viable but unexamined alternative renders an environmental impact statement inadequate." Dubois, 102 F.3d at 1287.

Specifically, the Outfitters contend that the Forest Service intentionally limited the alternatives it considered by not creating a plan that distributes use in specific areas, by considering only one alternative that provided for increases in visitor use, and by considering only one alternative that provided an increase in overnight entry quotas. The Outfitters complain that the Forest Service had a predisposition toward alternatives that would reduce visitor use.

Having reviewed the Final EIS and the agency findings, we conclude that the Final EIS is adequate to satisfy the requirements of NEPA. The Final EIS, as noted above, is a very long and detailed document. It provides ten alternative plans of agency action and states that the alternatives are based on visitor use levels and the effects of visitor use. (See Final EIS at 2-2, Outfitters' App. at 126, stating that "the range of alternatives developed and considered in this EIS relates to visitor use levels.") The

-21-

Final EIS explains that two alternatives were considered but eliminated from detailed study. One was a plan eliminating all visitor use from the area, which the agency found to be not practical; and the other was a plan allowing maximum visitor use, which the agency found would lead to widespread environmental degradation and would not provide visitors the opportunity for a wilderness solitude experience. Nevertheless, one of the viable alternative plans considered increased visitor use and another considered increased overnight entry quotas. Additionally, one alternative considered the current visitor use levels, and one considered redistributing the current level of visitor use. Other alternatives considered lowering visitor use beyond the level adopted as the final preferred plan. The Final EIS states that there is currently too much visitor use in some areas on some days, which results in excessive erosion, disturbed water quality and wildlife, diminished campsite availability, and a lack of solitude in some areas. (Final EIS at 1-6 - 1-7; Outfitters' App. at 122-23.) This adequately explains the lack of any further study on increasing visitor use. While the Outfitters complain that the Final EIS does not consider more alternatives that include increased visitor use, they present no reasons why increased visitor use should be considered a viable alternative. Neither do the Outfitters contend that additional evidence is necessary to demonstrate what environmental alternatives the agency ignored. See County of Suffolk, 562 F.2d at 1384 (indicating that it is sometimes necessary to look "outside the administrative record to see what the agency may have ignored"). Further, the Final EIS indicates, and the Forest Service found, that the current visitor use levels are beginning to strain the viability and solitude of the wilderness area and to degrade the intended primitive recreational experience. In light of this data and these findings, we fail to see how further consideration of increased visitor use levels, as urged by the Outfitters, would serve to "attain the widest range of beneficial uses of the environment without degradation," within the meaning of the statute. 42 U.S.C. § 4331(b)(3). There is no need for the agency to pursue alternatives that are contrary to the goals of the statute.

Second, the Outfitters contend that the Forest Service used inadequate data when deciding to limit the size of traveling groups to nine persons and four canoes. The

allegedly flawed data consists of (1) statistics concerning the number of visitors who are dissatisfied by the number of other visitors they encounter in the wilderness and (2) the use of a travel zone computer model and study of visitor traffic, which they assert amounts to a series of unverified assumptions used to reduce campsite occupancy levels. The Outfitters offer little to support their assertion that the Final EIS relies on flawed data. They cite to a study relied on by the Forest Service and attempt to contrast it with a 1988 survey by the same researcher. Even assuming the data was flawed in some respects, this one study was not the only source of information used by the Forest Service in compiling the Final EIS. "When an agency relies on a number of findings, one or more of which are erroneous, we must reverse and remand only when there is a significant chance that but for the errors the agency might have reached a different result." National Parks and Conservation Ass'n v. FAA, 998 F.2d 1523, 1533 (10th Cir.1993). The alleged flawed data deals with the number of campers who were satisfied or dissatisfied with their trip through the BWCA Wilderness, and clearly many more considerations went into the Final EIS than the satisfaction of visitors. The asserted flaw in how many were satisfied would not create a significant chance of a different result in this case.

As to the criticism of the computerized travel zone model, we note that the Final EIS itself includes a discussion of the benefits and possible pitfalls of this type of model. The Final EIS notes that the model was fully updated, that it takes into account travel patterns and length of stay, and that planners interpret the results to avoid extreme results that might otherwise be produced by the model in some instances. We defer to the agency's choice of methodology as long as it is not arbitrary or without foundation. See Minnesota Pub. Interest Research Group, 541 F.2d at 1302. We may not second-guess the values assigned to the environmental impacts considered in an agency study; and NEPA does not anticipate that courts will determine the merits of conflicting views between two or more schools of scientific thought. Id. It is not the role of this court to choose between differing studies or differing expert views. We defer to the agency's reasoned explanation. "NEPA does not require that we decide

whether an EIS is based on the best scientific methodology available, nor does NEPA require us to resolve disagreements among various scientists as to methodology." Oregon Envtl. Council v. Kunzman, 817 F.2d 484, 496 (9th Cir. 1987) (internal quotations and alterations omitted). "Our task is simply to ensure that the procedure followed by the agency resulted in a reasoned analysis of the evidence before it, and that the agency made the evidence available to all concerned." Id. (internal quotations and alterations omitted). It is not for this court to second-guess what is the best method of determining visitor satisfaction in the BWCA Wilderness, nor is it this court's role to scrutinize the scientific value of the computerized model. We are satisfied that the agency followed proper procedures, accumulated data, and explained the information in ways that permitted a reasoned analysis of the evidence for all concerned. The Outfitters' bare assertion that the model was "seriously flawed" (Outfitters' Reply Br. at 16) is not a sufficient basis on which this court will disregard the agency's methodology. Accordingly, we defer to the agency's choice of procedures and methods.

Third, the Outfitters contend that the Final EIS is inadequate because it identifies but fails to sufficiently evaluate all of the significant social and economic effects of the final Wilderness Plan. The Outfitters assert that the Final EIS concludes that the proposed Plan will have no adverse effect on the local economy without offering a reasoned explanation in support of this conclusion. To the contrary, the Final EIS devotes a great deal of discussion to the economic effects on the local communities of each alternative, including the potential job loss and the impact on local businesses. Concerning the final Wilderness Plan alternative, the EIS concludes that "a group size of 9 is sufficiently cost efficient to implement with little or no adverse economic impact on the local economy." (Final EIS at 4-48; Outfitters' App. at 222.) Prior to stating this conclusion, however, the Final EIS discusses the cost of this alternative, the recreational net value of reducing party size, and the amount of money and jobs lost in the local economy from the proposed plan, finding the total impact to be approximately .09% of the area economy. (Id.)

The Outfitters present affidavits from individual businessmen contesting this approximation of the economic impact, describing their business losses due to the final Plan. These select businessmen may feel the effect more concretely than others, but their affidavits do not discredit the Final EIS, which was based on this type of public comment as well as economic studies. The Final EIS states that in 1992, a draft EIS was released for public comment and was changed in response to those comments. The Outfitters also suggest that the Final EIS ignores a study by economist Jerrold M. Peterson, but the defendants and the Environmentalists contend that this study was flawed by improper assumptions. The draft EIS was based on an economic study by this same person. In our view, the Final EIS adequately discusses the impact on local economies.

Our review of the Outfitters' NEPA claims and the record before us convinces us that the Final EIS "contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences," and we conclude that the Final "EIS's form, content and preparation foster both informed decision making and informed public participation." Association of Pub. Agency Customers, 126 F.3d at 1183. We conclude that the Final EIS adequately considers the environmental, recreational, social, and economic impacts of the Wilderness Plan, and that the Forest Service's use of methodologies, studies, and data was not arbitrary or capricious.

III. Conclusion

For the reasons stated above, we reverse the district court's grant of summary judgment to the defendants on the issue of defining the phrase, "that particular lake." Summary judgment should be entered in favor of the Environmentalist plaintiffs on that claim. We disagree with the district court's conclusion that the Outfitters lack standing to bring their NEPA claims, but we affirm the district court's grant of summary judgment after considering the merits of the NEPA claims. In all other respects, we affirm the judgment of the district court.

-25-

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT