BYE, Circuit Judge,
concurring.
Based upon our recent decisions in Constanza v. Holder, 647 F.3d 749 (8th Cir. 2011) (per curiam) and Ortiz-Puentes v. Holder, 662 F.3d 481 (8th Cir.2011), I concur in the result reached by the majority. I do so reluctantly, however, and write separately to express my disagreement with our circuit’s as-a-matter-of-course adoption of “social visibility” and “particularity” as requirements for establishing “membership in a particular social group.” See 8 U.S.C. § 1101(a)(42)(A). While both decisions cited with approval the BIA’s new approach to defining “particular social group,” neither had before it the issue raised in this appeal: did the BIA act arbitrarily and capriciously in adding the requirements of “social visibility” and “particularity” to its definition of “particular social group.” While I am convinced it did, I am nonetheless bound by circuit precedent and therefore concur in the result.
Our circuit only recently addressed the BIA’s new approach to defining “particular social group.” While both Constanza and Ortiz-Puentes grafted the requirements of “social visibility” and “particularity” to petitioners’ social groups claims, neither panel offered any explanation as to why the addition of these new requirements— which are very clearly inconsistent with the BIA’s prior decisions—should not be deemed arbitrary and capricious. Neither panel inquired as to whether the BIA had provided a good reason, or any reason at all, for departing from established precedent. Neither asked if the BIA’s new approach to defining “particular social group” amounted to an arbitrary and capricious change from agency practice. Instead, we simply adopted the new approach, as a matter of course, offering no substantial reason ourselves for this shift in direction. As a result, I fear we have chosen the wrong direction.
In order to understand why the BIA’s addition of the “social visibility” and “particularity” requirements to the definition of “particular social group” is arbitrary and capricious, some background information is necessary. The BIA first attempted to define “particular social group” in Matter of Acosta, 19 I. & N. Dec. 211 (B.I.A.1985). In Acosta, the BIA relied on the canon of ejusdem generis to construe “membership in a particular social group” in a way which most closely resembles the definition of the other four grounds of persecution under the Immigration and Nationality Act (Act): race, religion, nationality, and political opinion. Id. at 233. After deducing commonalities between the five bases of persecution cognizable under the Act, the BIA defined “particular social group” as a “group of persons all of whom share a common, immutable characteris *683 tic,” which may be either “an innate one such as sex, color, or kinship ties” or a “shared past experience such as former military leadership or land ownership.” Id. In all such circumstances, BIA explained, the characteristic uniting the group must be “one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences.” Id. Because an occupation is not something individuals are either unable to change or, as a matter of conscience, should not be required to change, the BIA rejected an asylum claim by a taxi driver in the city of San Salvador premised on his membership in a taxi cooperative whose members were targeted by the guerillas for having refused to participate in guerrilla-sponsored work stoppages. Id. at 234.
During the next twenty years, the BIA applied the immutability definition of Acosta in a variety of contexts. The BIA’s published decisions recognized as a “particular social group” former members of Salvadorian national police (who could not change their past experience of serving in the police), see In re Fuentes, 19 I. & N. Dec. 658 (B.I.A.1988); members of the Marehan subclan of the Darood clan in Somalia (who shared kinship ties and linguistic commonalities), see In re H-, 21 I. & N. Dec. 337 (B.I.A.1996); Filipinos of mixed Filipino-Chinese ancestry (because their traits were immutable), see In re V-T-S- 21 I. & N. Dec. 792 (B.I.A.1997); young women of a certain Togo tribe who have not yet had a female genital mutilation (FGM) and who opposed the practice on moral grounds (because the “characteristic of having intact genitalia is one that is so fundamental to the individual identity of a young woman that she should not be required to change it”), see In re Kasinga, 21 I. & N. Dec. 357 (B.I.A.1996); and homosexuals in Cuba (based on the Board’s recognition of homosexuality as an immutable characteristic), see In re Toboso-Alfonso, 20 I. & N. Dec. 819, 822 (B.I.A.1990). With some variations, all circuits adopted the Acosta definition of “particular social group.” See generally Fat-ma E. Marouf, The Emerging Importance of “Social Visibility” in Defining a “Particular Social Group” and Its Potential Impact on Asylum Claims Related to Sexual Orientation and Gender, 27 Yale L. & Pol’y Rev. 47, 53 & n. 24 (2008) (stating federal courts “generally have followed Acosta” and cataloging relevant precedents) (hereinafter “The Emerging Importance of Social Visibility”). Our circuit adopted the Acosta definition as well, although it seemingly expanded it following the Ninth Circuit’s lead to also permit social groups based on a “voluntary associational relationship among the purported members.” Safaie v. INS, 25 F.3d 636, 640 (8th Cir.1994) (theorizing a group of Iranian women who refuse to conform to Iranian customs relating to dress and behavior and whose opposition is so profound that they would choose to suffer the severe consequences of noncompliance “may well satisfy the definition”) (citing the standard in Sanchez-Trujillo v. INS, 801 F.2d 1571, 1576 (9th Cir.1986)).
Beginning in 2006, however, the BIA started deviating from the Acosta definition of “particular social group” by emphasizing the importance of social visibility of a given group. In Matter of C-A-, for example,[2] the BIA reiterated its adherence *684 to Acosta, but listed “the extent to which members of a society perceive those with the characteristic in question as members of a social group” as a “relevant factor” in the analysis. 23 I. & N. Dec. 951, 956-57 (B.I.A.2006). Applying this standard, the BIA rejected the proposed social group of noncriminal drug informants working against the Cali drug cartel in Colombia in part because “the very nature of the conduct at issue is such that it is generally out of the public view.” Id. at 960.
The BIA continued the trend in Matter of A-M-E & J-G-U-, 24 I. & N. Dec. 69 (B.I.A.2007), by refusing to recognize a social group of “affluent Guatemalans” targeted for ransom. The BIA acknowledged the petitioners should not be expected to divest themselves of their wealth under the second prong of Acosta, but denied the claim on the basis of the applicants’ inability to show “social visibility,” id. at 75 (lamenting the lack of evidence to demonstrate “the general societal perception” of wealthy people was different from the common perception of groups at different socio-economic levels), and “particularity,” id. at 76 (criticizing the proposed group for being “too amorphous” and “indeterminate”). In its reasoning, the BIA drew on the Second Circuit opinion in Gomez v. INS, 947 F.2d 660, 664 (2d Cir.1991), where the court required members of a cognizable social group to possess “some fundamental characteristic in common which serves to distinguish them in the eyes of a persecutor—or in the eyes of the outside world in general.”
The biggest transformation in the BIA’s “particular social group” jurisprudence, however, came in its two most recent decisions issued on the same day in 2008: Matter of S-E-G-, 24 I. & N. Dec. 579 (B.I.A.2008), and Matter of E-A-G-, 24 I. & N. Dec. 591 (B.I.A.2008). Both confronted claims of gang-related persecution under the rubric of membership in a particular social group. In E-A-G-, the BIA refused to recognize social groups of “young persons who are perceived to be affiliated with gangs (as perceived by the government and/or the general public)” and “persons resistant to gang membership (refusing to join when recruited)” because these groups “have not been shown to be part of a socially visible group within Honduran society, and the respondent [does not] possess[] any characteristics that would cause others in Honduran society to recognize him as one who has refused gang recruitment.” 24 I. & N. Dec. at 593-94. In S-E-G-, the unsuccessful group was that of Salvadorian youth who have been subjected to recruitment efforts by the MS-13 and who have rejected and resisted membership in the gang based on their own personal, moral, and religious opposition to the gang’s values and activities. 24 I. & N. Dec. at 579. Their claim for asylum failed because, ac *685 cording to the BIA, it did not fare well under the “recent decisions holding that membership in a purported social group requires that the group have particular and well-defined boundaries, and that it possess a recognized level of social visibility.” Id. In essence, the decisions elevated the requirements of “social visibility” and “particularity” from merely some of the many factors in the holistic analysis of the issue to absolute prerequisites to establishing membership in a particular social group.
This new approach to defining “particular social group” split the circuits as to the validity and permissible extent of the BIA’s reliance on “social visibility” and “particularity.” Compare Valdiviezo-Galdamez v. Holder, 663 F.3d 582, 603-09 (3d Cir.2011) (concluding the BIA’s “social visibility” and “particularity” requirements are inconsistent with prior BIA decisions and rejecting the government’s attempt to graft these additional requirements onto petitioner’s social group claims); Gatimi v. Holder, 578 F.3d 611, 615-16 (7th Cir. 2009) (criticizing the BIA’s decisions in S-E-G- and E-A-G- for being “inconsistent” with the BIA’s precedents in Acosta and Kasinga and for failing to explain the reasons for adopting the “social visibility” criterion); Benitez Ramos v. Holder, 589 F.3d 426, 430-31 (7th Cir.2009) (denouncing the BIA’s insistence on “social visibility,” sometimes in its literal form, and charging the BIA might not understand the difference between visibility in a social sense and the external criterion sense); Urbina-Mejia v. Holder, 597 F.3d 360, 365-67 (6th Cir.2010) (noting being a former gang member is an immutable characteristic and defining former members of the 18th Street gang as a “particular social group” based on their inability to change their past and the ability of their persecutors to recognize them as former gang members), with Lizama v. Holder, 629 F.3d 440, 447 (4th Cir.2011) (upholding the BIA’s definition of a particular social group as requiring that “(1) its members share common immutable characteristics, (2) these common characteristics give members social visibility, and (3) the group is defined with sufficient particularity to delimit its membership”); Ramos-Lopez v. Holder, 563 F.3d 855, 862 (9th Cir.2009) (upholding the BIA’s adoption of the “social visibility” requirement); Scatambuli v. Holder, 558 F.3d 53, 60 (1st Cir.2009) (rejecting petitioners’ claims the BIA is precluded from considering the visibility of a group); and Fuentes-Hernandez v. Holder, 411 Fed.Appx. 438, 438-39 (2d Cir. 2011) (stating individuals who resisted gang recruitment in El Salvador do not constitute a “particular social group” because their proposed group lacked “social visibility” and “particularity” and because the alleged persecution “did not bear the requisite nexus to a protected ground”).
I agree with the circuits which hold the BIA’s addition of the “social visibility” and “particularity” requirements to the definition of “particular social group” is arbitrary and capricious. First, as discussed above, these newly added requirements are inconsistent with prior BIA decisions. Specifically, they are in direct conflict with the definition of “particular social group” announced in Acosta. By stating this, I am in no way suggesting the BIA must continue to adhere to the Acosta definition. I am of course cognizant the BIA may “add new requirements to, or even change, its definition of ‘particular social group’ ” over time. Valdiviezo-Galdamez, 663 F.3d at 608; see also Motor Vehicle Mfrs. Ass’n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 57, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (stating an agency may change its interpretation of a stature or regulation over time). The BIA, however, must explain its choice for *686 doing so because an unexplained departure from established precedent is generally “a reason for holding [the departure] to be an arbitrary and capricious change from agency practice[.]” Nat’l Cable & Telecomms. Ass’n v. Brand X Internet Servs., 545 U.S. 967, 981, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005); see also FCC v. Fox Television Stations, Inc., 556 U.S. 502, 129 S.Ct. 1800, 1811, 173 L.Ed.2d 738 (2009) (stating “the agency must show that there are good reasons for the new policy”); Friends of Boundary Waters Wilderness v. Dombeck, 164 F.3d 1115, 1123 (8th Cir. 1999) (noting “a sudden and unexpected change in agency policy” may be characterized as arbitrary and capricious).
Because the BIA departed from its well-established Acosta definition without providing a reasonable explanation for its choice, the departure is arbitrary and capricious. Thus, although I am bound by our decisions in Constanza and OrtizPuentes, I cannot agree with our circuit’s as-a-matter-of-course adoption of the BIA’s new approach to defining “particular social group”—an approach which not only represents a stark departure from established precedent, but also eviscerates protections for many groups of applicants eligible under the agency’s prior definition.
Therefore, I reluctantly concur in the result.

. The BIA signaled its intention to break away from the Acosta standard as early as 2001, in its decision in Matter of R-A-, 22 I. & N. Dec. 906 (B.I.A.2001). There, the BIA refused to accord a social group status to a group of "Guatemalan women who have been involved intimately with Guatemalan male companions who believe that women are to live under *684 male domination.” Id. at 917-18. Although the outcome of the opinion was unobjectionable even under the traditional Acosta standard, its logic was noteworthy for the BIA’s insistence that the applicant demonstrate "how the characteristic is understood in the alien’s society” and how "the potential persecutors ... see persons sharing the characteristic as warranting suppression or the infliction of harm.” Id. at 918. Because at the time R-A- was issued, the Immigration and Naturalization Service was in the process of finalizing a rule defining "membership in a particular social group,” the Attorney General vacated the BIA’s opinion pending the publication of that rule. In re R-A-, 22 I. & N. Dec. 906 (B.I.A.2001). The proposed rule would incorporate R-A~'s consideration of social visibility, but only as one of several nonexclusive factors. Asylum & Withholding Definitions, 65 Fed.Reg. 76,588, 76,594 (Dec. 7, 2000). Ultimately, the rule was never formalized, and the ball was back in the BIA's court to define the "particular social group” incrementally, on a case-by-case basis.