# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 00-1050

_____

Friends of Richards-Gebaur
Airport; City of Grandview,
Missouri, a Municipal corporation,

          Petitioners,

    v.

Federal Aviation Administration,
Jane Garvey, Administrator,

          Respondent.


City of Kansas City, Missouri; The
Kansas Southern Railway
Company,

        Intervenors on Appeal.

-----------------------------------------

Aircraft Owners and Pilots
Association,

      Amicus on Behalf of
Petitioner.

*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*

Petitions for Review of
an Order of the
Federal Aviation Administration.

_____

No. 00-1974

_____

Aircraft Owners and Pilots Association,    *
                       *
                       *
          Petitioner,    *
                       *
     v.    *
                       *
Federal Aviation Administration, Jane Garvey, Administrator; United States Department of Transportation, Rodney E. Slater, Secretary,    *

          Respondents.    *

The Kansas City Southern Railway Company; City of Kansas City, Missouri,    *

          Intervenors on Appeal.    *

_____

Submitted: June 13, 2000
Filed: June 11, 2001

_____

Before LOKEN, BRIGHT, and HANSEN, Circuit Judges.

_____

HANSEN, Circuit Judge.

The Friends of Richards-Gebaur Airport (Friends) and the City of Grandview, Missouri (Grandview), filed a petition for judicial review of an order of the Federal Aviation Administration (FAA) releasing airport property, challenging the order on environmental grounds. Consolidated with their petition is the separate petition of the Aircraft Owners and Pilots Association, challenging the FAA's statutory authority to make the release. After carefully considering the administrative record, we deny both petitions for review and affirm the order of the FAA.

I.

The Richards-Gebaur Airport was built in 1941 on land owned by the City of Kansas City, Missouri (city). In 1955, the city deeded the property free of charge to the United States Air Force for use as a permanent military base. The Air Force deactivated the base in 1976, declaring approximately 1,362 acres as surplus property. Since then, it has been a public use general aviation airport primarily serving small privately owned aircraft. In August 1985, the United States conveyed the property back to Kansas City, pursuant to the Surplus Property Act, see 49 U.S.C. § 47151 (1994). This conveyance required the city to use the property as a public use airport. Between 1986 and 1994, the city had accepted approximately $12.2 million in federal Airport Improvement Program funds for airport development, and each grant required the city to give written assurances that the airport would be available to the public for aeronautical use.

For several years, the Richards-Gebaur Airport had consistently lost money. Between 1983 and 1997, losses exceeded $18 million and were subsidized by the city's two commercial airports. The airport's losses were projected to continue at more than $1.5 million annually. In 1997, in an effort to pursue an opportunity to

3

redevelop the land into a new intermodal rail-truck freight distribution center,[1] Kansas City submitted an application to the FAA requesting permission to close the airport and seeking to be released from its federal obligations and assurances to maintain the property for public aeronautical use under the Surplus Property Act and the Airport Improvement Program.

The FAA and Kansas City negotiated a memorandum agreement dated July 1998, in which the FAA concluded that the terms it attached to the release and closure of the airport would result in a net benefit to aviation. The FAA found that although the facility was maintaining operation as a general aviation airport, it was able to do so only at substantial losses which were heavily subsidized by Kansas City's other commercial airports, draining funds otherwise available to those facilities. The FAA found that this financial burden was not necessary in a metropolitan area served by several other airports that remain available to general aviation. The memorandum agreement required Kansas City to deposit $5 million into an escrow account to be dispersed by the FAA for federally eligible aviation improvement projects in the Kansas City area.[2] The city also agreed that for 20 years, it would deposit all net

---

[1]"It is a goal of the United States to develop a national intermodal transportation system that transports passengers and property in an efficient manner." 49 U.S.C. § 47101(b) (1994). "A national intermodal transportation system is a coordinated, flexible network of diverse but complementary forms of transportation that transports passengers and property in the most efficient manner." Id. § 47101(b)(3).

[2]An amended memorandum of agreement was negotiated on March 20, 2000, to respond to the possibility that Kansas City would build (within five years) a replacement general aviation airport on the site. Other provisions of the agreement, however, remain identical to the first negotiated agreement, except that the release was modified to release initially only two parcels of land totaling 497 acres of the entire 1,362-acre property from the obligation to continue to use them for airport use. Those two parcels consisted of the existing airfield itself and related property which would, in turn, be used for the planned intermodal facility.

proceeds from the projected lease of the property into its aviation account for use solely for specified and general aviation projects. It agreed to notify the FAA of each disbursement from the net proceeds account and to permit the FAA to audit the account.

On February 22, 1999, the Kansas City City Council by ordinance approved a 50-year lease for development of the facility by the Kansas City Southern Railway Company (KCSR). The voters of Kansas City approved the ordinance in a referendum vote on August 3, 1999. On October 22, 1999, Kansas City submitted an Environmental Documentation Report, supported by exhibits, demonstrating that the development does not present any extraordinary circumstances that would require further environmental assessment.

In a letter dated December 23, 1999, the FAA released Kansas City from its federal obligations to maintain the property as an airport, allowing the city to close the airport and maintain the property as nonaeronautical, revenue-producing property of the Kansas City Aviation Department consistent with the memorandum of agreement. The FAA prepared no formal environmental analysis of this proposed action but considered several pertinent environmental factors before concluding that the closure was categorically excluded from the requirement of preparing an environmental assessment. The FAA issued its categorical exclusion evaluation on the same date as the letter releasing the airport property.

The record indicates that the public had an opportunity to participate in and comment on the proposed redevelopment throughout the more than two years in which the application was pending before the FAA. Thirty-five public meetings were held in a variety of locations in addition to open public meetings before the Kansas City City Council. Four of the public meetings were held in the neighboring City of Grandview, and there was substantial media coverage of the proposed redevelopment. A small number of citizens wrote letters opposing the project on a variety of grounds,

5

and a group of pilots formed the opposition group known as the Friends of Richards-Gebaur Airport. On the very afternoon that the FAA issued its release, the FAA received a faxed letter from the Mayor of Grandview expressing opposition to the release on environmental grounds, but this was the only opposition from any governmental agency throughout the two-year application process.

Pursuant to 49 U.S.C. § 46110 (1994), the Friends and Grandview filed in this court a petition for judicial review of the FAA's action, challenging the FAA's decision to categorically exclude the closure of this airport from the requirement of preparing an environmental assessment. The Aircraft Owners and Pilots Association also petitioned for judicial review, asserting that the FAA failed to satisfy the standards of the Surplus Property Act and lacked authority to release Kansas City from its federal obligations. We consolidated these petitions for purposes of briefing and argument, and permitted Kansas City and the Kansas City Southern Railway Company to intervene in support of the FAA's decision.

## II.

A court of appeals reviewing a petition for judicial review of an order of the FAA "has exclusive jurisdiction to affirm, amend, modify, or set aside any part of the order." 49 U.S.C. § 46110(c). In reviewing an order under this section, the court may consider only those objections made in the agency proceeding, unless there was a reasonable basis for not making the objection earlier. See id. § 46110(d). The statute mandates that the agency's findings of fact are conclusive as long as they are supported by substantial evidence. See id. § 46110(c). Because § 46110 does not specifically enunciate a standard for reviewing the FAA's nonfactual determinations, we turn to the Administrative Procedure Act (APA) for the appropriate standard. See 5 U.S.C. § 706. The APA prescribes that an agency action is unlawful and may be set aside if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Id. § 706(2)(A). In sum, while our factual inquiry on the

6

record must be "searching and careful," our scope of review is quite narrow; we are "not empowered to substitute [our own] judgment for that of the agency." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971). We determine merely "'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" Downer v. U.S. by and Through U.S. Dep't of Agric. and Soil Conservation, 97 F.3d 999, 1002 (8th Cir. 1996) (quoting Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 378 (1989)).

The petitioners essentially challenge two agency decisions. First, they challenge the FAA's decision to categorically exclude the proposal to close the airport from the requirement of preparing an environmental assessment under the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4370d (1994). Second, they challenge the FAA's decision to grant Kansas City a release from its federal obligations to maintain the property as an airport.

A. Categorical Exclusion

We begin with the environmental challenge. The Friends and Grandview contend that the FAA abused its discretion by not taking a hard look at the environmental impact of its decision as required by NEPA. See 42 U.S.C. § 4332(2). NEPA requires federal agencies taking major federal actions that significantly affect the quality of the human environment to prepare a detailed environmental impact statement considering the effects of and alternatives to the proposed action. See id. § 4332(2)(C). The environmental impact statement requirement ensures that agencies "take a 'hard look' at the environmental consequences of a project before taking a major action." Friends of the Boundary Waters Wilderness v. Dombeck, 164 F.3d 1115 (8th Cir. 1999) (internal quotations omitted).

NEPA's Council on Environmental Quality (CEQ) has promulgated regulations to provide federal agencies with guidance for complying with NEPA's requirements.

See 40 C.F.R. §§ 1500-1517. The regulations encourage agencies to document an environmental assessment, briefly providing the agency with sufficient evidence to determine whether the proposed agency action has no significant impact on the environment or whether the action has a significant impact that requires the preparation of a detailed environmental impact statement under NEPA. See 40 C.F.R. § 1508.9. The regulations also provide that agencies may categorically exclude certain types of federal activities from this case-by-case environmental assessment review. See id. § 1500.4(p) (requiring agencies to reduce paperwork in part by using categorical exclusions to define categories of actions that do not have a significant impact on the environment and are therefore exempt from NEPA's requirement to prepare an environmental impact statement); § 1507.3(b)(2)(ii) (requiring agencies to develop specific criteria for identifying categorical exclusions).

The CEQ regulations define categorical exclusions as "a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations." Id. § 1508.4. For actions falling within a categorical exclusion, neither an environmental assessment nor an environmental impact statement is required. See id. The regulations require that an agency must also consider exceptions to the categorical exclusions by listing "extraordinary circumstances in which a normally excluded action may have a significant environmental effect," thus requiring the preparation of an environmental assessment. Id.

Consistent with these CEQ regulations, the FAA promulgated a list of categorical exclusions and characteristics amounting to extraordinary circumstances, which are set forth in the Airport Environmental Handbook, FAA Order 5050.4A. (See Petitioners' App. at 900-903.) The federal release of airport land is listed in the Handbook as an action that is categorically excluded from the requirement of preparing a formal environmental assessment. (See id. at 901; FAA Order 5050.4A,

¶ 23 (10).) Relevant factors listed as extraordinary circumstances include any action that is likely to (1) have an effect on property protected under the Historic Preservation Act, (2) be highly controversial on environmental grounds, (3) be highly controversial with respect to the availability of relocation housing, (4) cause a significant increase in surface congestion, or (5) have a significant impact on noise levels or air quality. (Petitioners' App. at 902; FAA Order 5050.4A, ¶ 24.) FAA Order 5050.4A is an interpretive agency order. Because it does not contain agency rulings reached as a result of adjudicatory adversary proceedings or formal rule making, it is not entitled to Chevron-type deference, but the order is nevertheless accorded respect by the courts to the extent it has the power to persuade. See Christensen v. Harris County, 120 S. Ct. 1655, 1662-63 (2000); Skidmore v. Swift & Co., 323 U.S. 134, 139-40 (1944); see also Drake v. Honeywell, Inc., 797 F.2d 603, 607 (8th Cir. 1986) (stating that interpretive rules provide guidance to parties and "carry no more weight on judicial review than their inherent persuasiveness commands") (internal quotations omitted). The FAA's Airport Environmental Handbook, "while not controlling upon the courts by reason of [its] authority, do[es] constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." Skidmore, 323 U.S. at 140.

The petitioners do not argue that the federal release of airport land is an action that cannot be categorically excluded from the environmental assessment requirement, and we have no reason to doubt the agency's informed decision in this matter. Instead, they contend that the FAA failed to adequately consider all of the relevant extraordinary circumstances that would prevent the use of the categorical exclusion in this particular case.

The FAA documented its categorical exclusion evaluation in this case in which it considered and discussed the relevant extraordinary circumstances listed in FAA Order 5050.4A. Specifically, the FAA considered the effect of the proposed action on property subject to the National Historic Preservation Act, the potential noise, air

9

quality, and water quality consequences of the action, its effect on farmlands, whether the action was highly controversial on environmental grounds, its effect on the natural environment, the availability of relocation housing, the potential community disruption, the cumulative impact of the action (including the project's effect on air quality and surface traffic congestion), and other relevant aspects likely to be at issue with this project. The FAA concluded that based upon its evaluation of the likely impacts of the proposed action, no extraordinary circumstances existed to preclude a categorical exclusion of this action from the environmental assessment requirement. (See Petitioners' App. at 31.)

We review an agency's determination that an action falls within a categorical exclusion under the arbitrary and capricious standard. See Alaska Ctr. for the Env't v. United States Forest Serv., 189 F.3d 851, 857 (9th Cir. 1999). The Friends and Grandview contend that the FAA acted arbitrarily and capriciously in determining the categorical exclusion applied, asserting that several extraordinary circumstances required the FAA to take a closer look by completing an environmental assessment. We consider each challenged extraordinary circumstance in turn.[3]

1.  Highly Controversial on Environmental Grounds

The petitioners assert that the release of airport property was highly controversial on environmental grounds. The FAA's order states that a proposed

_____

[3]We do not reach the petitioners' allegations that the FAA's decision to release the property was preordained and the outcome predetermined. Our review of the extra-record affidavits relied on by the petitioners in an attempt to prove bad faith or improper motives on the part of the FAA convinces us that they do not rise to the level of the "'strong showing of bad faith or improper behavior'" which would permit us to look behind the decision and overcome the presumption of regularity accorded agency action. Newton County Wildlife Ass'n v. Rogers, 141 F.3d 803, 807 (8th Cir. 1998) (quoting Overton Park, 401 U.S. at 420).

10

action is highly controversial on environmental grounds (thus requiring the preparation of an environmental assessment) when the action is opposed on environmental grounds by a government agency or a substantial number of the persons affected by the action. (See Petitioners' App. at 902; FAA Order 5050.4A, ¶ 24 (b).) The FAA found no significant environmental opposition.

The petitioners assert that the FAA completely ignored the faxed letter from the Mayor of Grandview challenging the action on environmental grounds. The FAA received no governmental environmental opposition until it received the mayor's letter on the very day it issued its decision and its supporting extraordinary circumstances evaluation. Regardless of any dispute over the timing of when FAA officials actually received the letter during that day, we consider this one letter of governmental opposition to be too little, and far too late in a public proceeding that had been ongoing for approximately two years. Thus, the FAA did not act arbitrarily or capriciously by concluding that there was no governmental opposition to the action.

Concerning citizen opposition, the FAA noted that it received 65 citizen letters opposing the project, of which only approximately 20 expressed environmental concerns. Even considering all of the opposing letters, however, the FAA concluded that this number was insufficient to constitute substantial opposition on environmental grounds where the population of the area most affected (the communities of Belton and Grandview) exceeds 40,000. The agency determination that 65 letters opposing the project (most of which did not voice environmental concerns) did not constitute a substantial controversy on environmental grounds is not arbitrary on this record.

The petitioners argue the FAA ignored evidence that, although the residents of Kansas City as a whole voted by referendum to pass an ordinance authorizing the city to proceed with the project, the majority of voters in wards closest to the airport voted

11

"no," and the citizens of Belton and Grandview, the areas most affected, had no vote. The petitioners assert that these circumstances reflect a concern that the project was highly controversial on environmental grounds. We disagree. Although the citizens of Belton and Grandview have no vote on ordinances affecting property within the City of Kansas City, four of the thirty-five public meetings were held in Grandview in an effort to give its citizens an opportunity to voice their concerns about the project, yet no substantial environmental opposition arose. Also, those Kansas City residents who voted "no" for the project did not provide any reasons explaining their vote and evidently did not write letters to the FAA informing it of any environmental concerns. Thus, the FAA did not act arbitrarily by ignoring the evidence of "no" votes in wards closest to the affected area and the citizens of Belton and Grandview certainly were not isolated from the proceedings.

### 2. Community Disruption and Surface Traffic

The petitioners contend that the FAA ignored or improperly discounted evidence indicating that a substantial community disruption was likely and that the action would cause a significant increase in surface traffic congestion. This contention lacks merit. The FAA's categorical exclusion evaluation did consider the potential for community disruption and added surface traffic, concluding in relevant part that the project will not adversely affect local traffic movement and that planned highway improvements will more than adequately handle the traffic generated by the intermodal facility.

The FAA found that the Missouri Department of Transportation (MDOT) has considered the proposed intermodal facility in its design for improving Route 150, Route 58, and the interchanges of I-435, I-470, and Route 71. MDOT reported by letter that the planned roadway and interchange improvements will accommodate the additional truck traffic from the facility, even at its "full build out." (Petitioners' App. at 55.) The Environmental Documentation Report submitted by Kansas City, and

12

considered by the FAA, notes that using railcars to carry more than one truck container actually results in fewer trucks on the roadways. (See id. at 615.) This report notes that "[b]ased on traffic studies to date, the intermodal facility will contribute less than 1% increase in traffic" to the area. (Id. at 616.) The report concluded that even in the worst case scenario, the adverse traffic effects of increased truck and rail traffic would be offset by new highway construction and improved intersections. An agency may rely "on mitigating measures to be undertaken by a third party" in making its finding of no significant impact. Audubon Soc'y of Cent. Ark. v. Dailey, 977 F.2d 428, 435-36 (8th Cir. 1992).

Additionally, the FAA found that no additional train traffic would occur for five years, after which the train traffic could be expected to increase 16% over the next twenty years. The Kansas City Southern Railway Company indicated that even assuming a 10% growth rate per year, no additional trains would be required in the first five years of operation because the present trains are currently running under capacity. (See Petitioners' App. at 649.) Based upon these studies and the opinions of expert consultants, the FAA found that the anticipated increase in train and truck traffic will not significantly affect the movement of local traffic or alter any planned development. The record supports this finding.

The petitioners argue that the FAA acted arbitrarily by relying on documents that underestimate the capacity of the facility, which is measured in "lifts per year."[4] The petitioners argue that the FAA estimated only 120,000 lifts per year, yet plans to develop the facility show that up to about 500,000 lifts per year will be performed, which represents only about 70% of the facility's capacity. The petitioners assert that 100% growth is reasonably foreseeable and should be assumed.

---

[4]A lift is accomplished by an overhead crane that either takes a truck trailer off the ground and places it on the rail car or vice versa. (See Petitioners' App. at 642.) Lifts are the means by which revenue is generated for the facility.

We are not in a position to question the veracity of the growth estimate. The Environmental Documentation Report and its supporting exhibits indicate an initial estimation of 120,000 lifts per year, but the report also assumes a twenty-year growth pattern, stating that "Kansas City Southern is hoping to grow the facility to about 500,000 lifts a year." (Petitioners' App. at 641.) In the next sentence, the report states that "[t]he goal factor is about 10% a year." All of this information was contained in the Environmental Documentation Report, which was properly before the agency. The FAA's findings are supported by this documentation, and the FAA has articulated a rational connection between the facts and the conclusions it made. The FAA was entitled to rely on expert documentation provided in the record, and we cannot say that the agency's findings on this point lack substantial evidence to support them.

The petitioners argue that the FAA's reliance on the Environmental Documentation Report, which concludes that there is no significant impact from the proposal, is arbitrary and capricious because it was provided by Kansas City, a proponent of the project. They also question the source of information underlying the MDOT's projections of intermodal traffic. The FAA urges that it independently reviewed the environmental consultants' analysis and concurred with the conclusions reached. The FAA also asserts that it is allowed to rely on the opinion of a state government agency. We agree with the FAA. Our duty is merely to ensure that the agency considered the proper factors and made no clear error of judgment. See Marsh, 490 U.S. at 378. "Once the agency considers the proper factors and makes a factual determination on whether the impacts are significant or not, that decision implicates substantial agency expertise and is entitled to deference." Alaska Ctr. for the Env't, 189 F.3d at 859. "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." Marsh, 490 U.S. at 378. We conclude that the FAA was entitled to rely on expert consultants, including the opinions of other governmental agencies, especially where

the evidence deals with scientific judgments.  See United States v. Grand Labs., Inc., 174 F.3d 960, 964 (8th Cir. 1999).

### 3.  Noise Pollution

The FAA found "that most of the DNL 65 dB noise contour resulting from the intermodal facility's train and truck traffic will remain well within the facility's boundaries."  (Petitioners' App. at 32.)  The symbol DNL (or Ldn) represents the "[d]ay-night average sound level," which is a decibel measurement of the average sound level for a 24-hour period.  14 C.F.R. § 150.7.  The FAA has determined that all land uses are considered to be compatible with noise levels that are less than DNL 65 dB.  Id. § A150.101(d).  Airports are required to develop noise exposure maps showing contour lines of DNL 65, 70, and 75 dB.  In areas where the noise level is DNL 65 dB or greater, land uses must be identified and their compatibility determined.

To this end, the FAA has developed a table indicating appropriate noise levels that can be tolerated for different land uses.  The noise sensitive area nearest to the proposed facility is the Belton Community Golf Course, which is 800 feet away from the noise source.  The land use table indicates that a golf course can tolerate noise levels of  DNL 65-70 dB.  See 14 C.F.R. Pt. 150, App. A, Table 1-Land Use Compatibility.  The study indicates that the nearest point of the golf course is within the 65-70 dB contour lines of the facility.  The nearest residence is located over 2000 feet away, which is well away from the DNL 65 dB contour line even under the full build-out scenario.  Accordingly, the FAA concluded that the project will not significantly increase noise in any noise sensitive areas, and therefore no further analysis was necessary.

The petitioners contend that the use of an unreasonably low number of expected lifts adversely affected the noise study.  We disagree.  The record indicates

15

that the noise study includes full calculations for a full build-out scenario, as well as calculations based on the 120,000 lift estimation. The Environmental Documentation Report specifically took into account the full build-out scenario, providing full calculations for a full build-out of the facility. The study indicated that resulting noise levels were well below acceptable levels. The full build-out calculations indicate a DNL 70 dB in the worst-case scenario. Additionally, the study indicates that "the intermodal facility only generates noise in a localized and limited area (300 to 700 feet) adjacent to the facility, while the airport generates noise patterns extending over 5,000 feet away." (Petitioners' App. at 810.) There is no indication that the FAA ignored evidence relevant to the noise impact of the facility.

The petitioners also assert that the FAA ignored the possibility of continued airport use of the facility. To the contrary, the FAA addressed the potential noise impact from continued use of the facility as an airport as a cumulative impact but concluded that while there is a possibility of future airport development at this site, there is no proposal reasonably foreseeable at this time. Furthermore, any future airport plans would be subject to appropriate environmental review when proposed. Thus, this possibility is an insufficient basis on which to find that the FAA's action at this time was arbitrary.

The petitioners' remaining contentions are based in large part on the opinion of their own expert, which was not made a part of the administrative record. Through a motion to this court, petitioners sought to supplement the record with letters and expert opinions that were not before the agency, in order to show that the agency overlooked substantial environmental issues and relevant factors. We are not in a position to substitute our own judgment for that of the agency by considering expert testimony that was not made a part of the administrative record. "[W]hen a litigant challenges an agency determination on grounds that, in essence, allege that the agency's expert review was incomplete, inconclusive, or inaccurate, the greater degree of deference expressed by the arbitrary and capricious standard is appropriate."

Greenpeace Action v. Franklin, 14 F.3d 1324, 1331 (9th Cir. 1992) (alterations, quotations, and citations omitted). Once we determine that an agency's discretion is truly informed, we must defer to that informed discretion. See Marsh, 490 U.S. at 377; Greenpeace, 14 F.3d at 1332; see also Newton County Wildlife Ass'n v. Rogers, 141 F.3d 803, 808 (8th Cir. 1998) (noting that our inquiry ends when we are satisfied that the agency considered all of the information available at the time of its decision).

Our review of the record indicates that the FAA considered all relevant factors and available evidence relating to the noise impact of the facility. The FAA's conclusions are based on substantial scientific data, and not on mere speculation. NEPA does not require courts to resolve disagreements among experts. See Greenpeace, 14 F.3d at 1333. "[T]he record in this case reveals no complete failure to consider crucial factors." Id. Accordingly, we deny the petitioners' motion to supplement the record.

In a noise-related argument, the petitioners contend that the noise impact of the facility on the nearby Belton Community Golf Course will interfere with enjoyment of the golf course so as to amount to a "use" of the property. Section 4(f) of the Department of Transportation Act provides in relevant part that the "use" of publicly owned land or a public park may be approved only if there is no feasible alternative and the project includes all possible planning to minimize the resulting harm. See 49 U.S.C. § 303(c). The FAA's Environmental Handbook provides that an action that is likely to use Section 4(f) lands is an extraordinary circumstance requiring an environmental assessment. (See Petitioners' App. at 902; FAA Order 5050.4A, ¶ 24(a).) As already noted, the FAA found that the nearest part of the golf course lies about 800 feet from the boundary of the proposed facility. The full build-out worst-case scenario shows a DNL 70 dB contour line encompassing property within 700 feet of the noise source and a DNL 65 dB contour line encompassing property within 700 to 1400 feet from the noise source. (Petitioners' App. at 834.) The FAA determined that the golf course is a compatible land use with the facility's DNL 65-70

17

dB level of noise. The record supports the FAA's finding that the proposed action will not physically take or "use" Section 4(f) property.

## 4. Air Quality

FAA Order 5050.4A, paragraph 24 (f), states that an extraordinary circumstance exists where a government action has a significant impact on air quality. (See Petitioners' App. at 902.) The FAA considered the intermodal facility's potential effect on the air and determined that the resulting air quality impacts are not significant. Since its initial determination, however, the FAA has identified a mathematical miscalculation in its original analysis, which resulted in an underestimate of the air quality impacts. We permitted the FAA to correct the record calculations based upon accurate information. The new calculations provided by the FAA continue to indicate that the air quality effects of the new facility do not rise to a significant level.

The petitioners contend that the FAA overlooked a significant impact on air quality because the study was based on underestimated traffic assumptions. We concluded earlier that the traffic analysis was not seriously underestimated. The petitioners also point to the opinion of their own expert for their assertion that the FAA's air quality analysis is flawed. We have denied their attempt to supplement the record with this expert opinion. Also, there is no merit to the contention that an EIS must be prepared whenever qualified experts disagree. See Greenpeace, 14 F.3d at 1335. We refuse to engage in a de novo review of scientific data and opinions that are within the expertise of the agency.

## 5. Historical Property

The Friends assert that the facility will have an adverse effect on a historical property. Although one building on the property is potentially eligible for protection

18

under the National Register of Historic Places, the FAA determined that it is outside of the area of potential effect because it is not within the boundary of the lease, and any impacts on historical property resulting from the project will not extend beyond the lease line boundaries. We see nothing arbitrary in this decision. Also, the FAA considered the fact that the airport was named after two local pilots killed during World War I and the Korean War, but it concluded that this does not make the airport eligible for protection as a historic site. The FAA considered the relevant factors, and we will not disturb its finding of no significant impact.

6. Relocation Housing

The FAA's Airport Environmental Handbook states that an extraordinary circumstance exists if the action is "likely to be highly controversial with respect to the availability of adequate relocation housing." (Petitioners' App. at 902; FAA Order 5050.4A, ¶ 24(d).) The FAA found that the intermodal facility project is not controversial with respect to the availability of relocation housing because it does not involve any housing issues and will not require the relocation of any residents. The FAA also considered that the action will require the closure of the fixed base operation and the hangar facilities at the airport. The FAA found that sufficient general aviation facilities are available in the area, although the hangar space is inadequate. In spite of the inadequacy of available hangar space, the FAA did not alter its finding that the action is not highly controversial on the issue of relocation housing.

The Friends contend that the FAA defined adequate relocation housing too narrowly by ignoring the inadequacy of available hangar space for aircraft that will need to be relocated. They cite 42 U.S.C. § 4601(6)(A) (1994), of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, which defines "displaced person" as "any person who moves from real property, or moves his personal property from real property" as a direct result of an agency action. The

Friends contend that the agency's interpretation of the statute as involving only housing issues, and not also displacement of personal property, reads the statute too narrowly.

In the context presented here, we disagree. The FAA's order is specifically concerned with the environmental impact of agency actions that relocate people or businesses. We do not believe the FAA purports to implement the Uniform Relocation Assistance and Real Property Acquisition Policies Act in its handbook. Instead, the FAA is implementing the policies of NEPA and has discretion in doing so to decide that the displacement of people from their housing has a significant impact on the human environment, while the relocation of airplanes does not. Nothing in the handbook prevents the pilots from obtaining any federal assistance to which they may be entitled under the Uniform Relocation Assistance and Real Property Acquisition Policies Act due to the relocation of their personal property. The FAA was not arbitrary in deciding that any difficulty experienced in obtaining hangars for relocated airplanes does not create an environmental concern requiring the preparation of an environmental assessment in this case.

7. Railroad Construction

The Friends also contend that although the agency may properly categorically exclude the release of airport property, it may not categorically exclude the construction of a railroad track. However, the FAA did not categorically exclude the construction of a railroad track. The FAA properly considered the potential environmental impact that might result from the proposed facility. Whether the construction of track is considered a railroad line subject to the jurisdiction of the Surface Transportation Board (STB), see 49 U.S.C. § 10501(b) (Supp. IV 1998), or an industrial, team, switching, or side track that is not within the STB's jurisdiction, see 49 U.S.C. § 10906 (Supp. IV 1998), is a matter to be considered in the first instance by the STB. We agree with the FAA that this question is not properly before

us at this time. It is enough that the FAA considered the relevant resulting environmental factors and determined them to have no significant impact on the environment.

### B. The Decision to Release the Federal Obligations

The Aircraft Owners and Pilots Association (AOPA) challenges the FAA's authority to grant a release from the federal obligations that were imposed upon Kansas City by reason of the Surplus Property Act and the Airport Improvement Act. Because AOPA did not make this challenge before the agency and has not proffered any reasonable basis for not making the objection at that time, we will not consider the argument here. See 49 U.S.C. § 46110(d) (stating that the court reviewing an FAA order may consider only those objections made in the agency proceeding, unless there was a reasonable basis for not making the objection earlier); see also Northwest Airlines, Inc. v. FAA, 14 F.3d 64, 73 (D.C. Cir. 1994) (noting that even objections challenging the agency's authority to act must be raised before the agency in the first instance).

AOPA also challenges the decision to release the federal obligations as arbitrary, capricious, and contrary to law. In this case, Kansas City sought release from its federal obligations to make the airport available to the public for aeronautical use. The FAA granted the request, finding in its amended and restated memorandum of agreement that "the City has subsidized the Airport with revenue from the other airports owned and operated by the City" and that "the City has identified an alternative use for the Property that will generate additional revenue for the regional aviation system and permit aviation funds now used to subsidize Richards-Gebaur to be used for future improvements" at Kansas City's other airports. (Petitioners' App. at 879.) Additionally, the memorandum specifically finds:

[I]n consideration of the number of public-use general aviation airports in the Kansas City area; the fact that at least three of these airports are within convenient driving distance of the areas served by Richards-Gebaur; the fact that the sponsor of Richards-Gebaur Airport, Kansas City, operates two other airports serving the Kansas City area; the fact that the remaining value of Airport Improvement Program (AIP) investments in Richards-Gebaur recovered from the City may be reinvested in other general aviation capacity projects in the Kansas City area; the fact that the proposed redevelopment of the Property will produce substantial revenue for aviation development in the Kansas City airport system; and the fact that a significant part of this revenue stream will be committed to general aviation projects in the Kansas City airport system; the FAA finds that highly unusual circumstances exist that would support a finding that the release and closure of the Richards-Gebaur Airport would result in a net benefit to aviation . . . ."

(Petitioners' App. at 880.)

The statute provides that the Secretary of Transportation "may waive" the conditions of a surplus property gift if the Secretary decides (1) that "the property no longer serves the purpose for which it was given," or (2) that "the waiver will not prevent carrying out the purpose for which the gift was made and is necessary to advance the civil aviation interests of the United States." 49 U.S.C. § 47153(a)(1). The Secretary also "shall waive a term under paragraph (1) of this subsection on terms the Secretary considers necessary to protect or advance the civil aviation interests of the United States." Id. § 47153(a)(2); see also 14 C.F.R. § 155.3(a)(1), (2) (restating the statutory grounds that may be the basis for a release). AOPA contends that the FAA failed to satisfy the standards of the Surplus Property Act because nowhere in its findings did the FAA state that the waiver was "necessary," as required by the language of the statute. See 49 U.S.C. § 47153(a)(1)(B).

We initially reject the FAA's assertion that AOPA did not raise this plain language objection before the agency. The argument may not have been made as

thoroughly as it is in the petition for review, but AOPA specifically quoted the language of the statute in a letter to the FAA dated September 21, 1998, complaining that the memorandum of agreement "does not conclude or explain how the release 'is NECESSARY to advance the civil aviation interests of the United States.'" (Respondents' App. at 75 (quoting 49 U.S.C. § 47153(a)(1)(B), emphasis in original)). We conclude that this complaint to the agency sufficiently preserved the plain language argument asserted here. Thus, we move on to consider whether the agency's interpretation of the statute in making the release was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

As AOPA complains, nowhere in the memorandum of agreement or in the actual letter releasing the property does the FAA specifically state that the release of the Richards-Gebaur Airport property is "necessary to advance the civil aviation interests of the United States," as it is worded in the statute. Instead, the memorandum of agreement lists all of the reasons why a release is beneficial and after considering them, concludes, in the language of an FAA order, that the release "would result in a net benefit to aviation." (Petitioners' App. at 880.) For the following reasons, we do not believe this to be fatal to the FAA's decision.

The regulation implementing the statute quotes the statutory language in large part without specifically interpreting how the FAA will determine when a release is "necessary" to protect or advance aviation interests. See 14 C.F.R. § 155.3(a)(2). In the FAA's interpretive order, Order 5190.6A entitled Airport Compliance Requirements, the FAA states that "[a] total release, permitting the sale and disposal of real property acquired for airport purposes under the Surplus Property Act, shall not be granted unless it can clearly be shown that the sale of such property will benefit civil aviation." (Petitioners' App. at 1040.) The FAA's general policy regarding the release of surplus property allows property to "be released for sale or disposal upon a demonstration that such disposal will produce an equal or greater

23

benefit (to the airport or another public airport) than the continued retention of the land." (Id. at 1040-41.) The FAA determined that such a release effectively authorizes "the conversion of a real property asset into another form of asset (cash or physical improvements) which better serves the purpose for which the real property was initially conveyed." (Id. at 1041.) The FAA's order states that an airport owner requesting a release must justify the request, and could do so by "showing that the expected net proceeds from the sale of the property at its current market value will be required to finance items of airport development and improvement; the need for which is concurred in by the FAA." (Id.)

Once again we must consider the persuasive force of an FAA order which is not the product of formal adjudication and not a regulation entitled to Chevron deference. See Christensen, 120 S. Ct. at 1662-63. Such decisions are "'entitled to respect,'" but only to the extent that they have the "'power to persuade.'" Id. at 1663 (quoting Skidmore, 323 U.S. at 140). AOPA argues that the FAA's order is not persuasive because it is contrary to the plain language of the statute. We respectfully disagree.

We maintain our long-standing opinion that "[a] statute is the command of the sovereign," and an agency implementing a statute may not ignore, or provide its own substitute for, a standard articulated in the statute. See Sokol v. Kennedy, 210 F.3d 876, 880 (8th Cir. 2000). We conclude, however, that the FAA has neither ignored nor provided a substitute for the articulated statutory standard in this case. Instead, the agency has properly exercised its discretion to add objective criteria to aid in its application of the statutory standard. Both the statutory and regulatory language states that a release must be "necessary to protect or advance the civil aviation interests of the United States." 49 U.S.C. § 47153(a)(2); 14 C.F.R. § 155.3(a). The FAA's interpretive order provides some guidance for the agency's determination of what is "necessary" to this purpose. It is within the FAA's discretion to determine the

24

criteria for assessing when a release is necessary to protect or advance civil aviation interests within the language of the statute.

The FAA's order interprets the statutory and regulatory standard as satisfied so long as the release of the property "can clearly be shown . . .[to] benefit civil aviation." (Petitioners' App. at 1040.) As earlier noted, this policy allows a release when the conversion of the real property into another asset better serves the purpose for which the real property was initially conveyed. A contrary interpretation would require the continued use of airport property in a manner that does not best serve the purpose of the original gift. We conclude that it was reasonable for the FAA to determine that a release providing a net benefit to aviation is "necessary" to advance and protect civil aviation within the meaning of the statute.

AOPA does not challenge the factual record showing that the closure of the airport will result in a net benefit but challenges the FAA's failure to use the exact statutory language in its memorandum of agreement. The FAA counters that it was not required to use the exact statutory language in its findings, citing Ethyl Corp. v. EPA, 541 F.2d 1, 12 n.15 (D.C. Cir.) (stating, "[i]t is well established that ultimate findings do not have to be expressed at all, let alone be expressed in the language of the statute"), cert. denied, 426 U.S. 946 (1976). We agree with the FAA that in this instance, where the agency expressed its findings in the language of its interpretive order, which we have concluded reasonably interprets the statute, the FAA was not required to quote the exact statutory language in its findings. Despite the FAA's failure to couch its findings in the language of the statute, the record persuades us that the airport closure in this instance will result in an otherwise unavailable and significant benefit to aviation and therefore is necessary to advance and protect the aviation interests of the United States. Thus, the FAA's decision is not arbitrary, capricious, or contrary to law.

III.

25

Accordingly, we deny the petitions for review and affirm the order of the FAA releasing Kansas City from its federal obligations to maintain the property for aeronautical use. All pending motions to supplement the record are denied.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.