# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-3567

_____

| | | |
|---|---|---|
| Central South Dakota Cooperative Grazing District, | * | |
| | * | |
| | * | |
| Appellant, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the |
| Secretary of the United States | * | District of South Dakota. |
| Department of Agriculture; | * | |
| Chief of the United States | * | |
| Forest Service; Regional Forester | * | |
| of the Rocky Mountain Region of the | * | |
| United States Forest Service; | * | |
| Forest Supervisor of the Nebraska | * | |
| National Forest of the United States | * | |
| Forest Service, | * | |
| | * | |
| Appellees. | * | |

_____

Submitted: June 15, 2001

Filed: September 24, 2001 (Corrected: 10/23/01)

_____

Before MURPHY, HEANEY, and BEAM, Circuit Judges.

_____

BEAM, Circuit Judge.

Central South Dakota Cooperative Grazing District (Grazing District) appeals the district court's[1] grant of summary judgment affirming administrative action by the United States Department of Agriculture Forest Service (Forest Service).[2] The Grazing District argues that the Forest Service violated the National Environmental Policy Act of 1969 (NEPA), specifically, 42 U.S.C. § 4332, because it failed to consider reasonable alternatives to reducing grazing levels in the Fort Pierre National Grasslands (Grasslands), and that its methodologies for assessing species populations and range conditions were so unreliable that they made its choice of stocking levels arbitrary and capricious. The Forest Service responds, in part, by asserting that the Grazing District lacks standing to pursue its NEPA claim. We affirm the district court's grant of summary judgment in favor of the Forest Service.

## I.    BACKGROUND

The National Forest Management Act of 1976 (NFMA), 16 U.S.C. §§ 1600 et seq., provides for a two-phase forest planning process. First, the Forest Service is to develop a Land and Resource Management Plan (forest plan), which is a "general planning tool" that "provides guidelines and approved methods by which forest management decisions are to be made." Sierra Club v. Robertson, 28 F.3d 753, 758 (8th Cir. 1994). Forest plans are to be prepared in accordance with NEPA. 16 U.S.C. § 1604(g)(1); Robertson, 28 F.3d at 758. Second, the Forest Service implements the forest plan through site-specific actions, assessing each such action to determine its compatibility with the forest plan, NEPA,[3] and other applicable law.

---

[1]The Honorable Richard H. Battey, United States District Judge for the District of South Dakota.

[2]We refer to the appellees collectively as "the Forest Service."

[3]NEPA requires that an Environmental Impact Statement (or EIS) be prepared for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An Environmental Assessment (or EA) is a

Sierra Club v. United States Forest Serv., 46 F.3d 835, 837 (8th Cir. 1995) [hereinafter U.S. Forest Service]. If the proposed action was not adequately analyzed in an Environmental Impact Statement (or EIS) for the forest plan, as required by NEPA, a project-level EIS must be completed, unless the agency has determined through its Environmental Assessment (or EA) that the project will not significantly affect the environment (finding of no significant impact, or FONSI), in which case the EA itself may suffice. 40 C.F.R. § 1500.4(q); U.S. Forest Service, 46 F.3d at 837, 840.

Under this NFMA configuration, a forest plan identifies suitable grazing lands, while permits to graze, if appropriate under that general plan, are issued pursuant to an appropriate site-specific project analysis. See generally Lujan v. National Wildlife Fed'n, 497 U.S. 871, 892 n.3 (1990) (mining permits); U.S. Forest Service, 46 F.3d at 837 (timber sales); Robertson, 28 F.3d at 759 (same); Natural Res. Defense Council, Inc. v. Hodel, 624 F. Supp. 1045, 1061 (D. Nev. 1985) (grazing permits). Grazing permits "convey no right, title, or interest" in lands or resources, 36 C.F.R. § 222.3(b), and are subject to modification according to changes in management needs or resource conditions, 36 C.F.R. § 222.4(a)(7) & (8).

In this case, the Grazing District is an association that has a permit to graze cattle upon the Grasslands. In 1984, after completion of an EIS, the Forest Service adopted and approved the Nebraska National Forest Land and Resource Management Plan (Nebraska Forest Plan) to regulate use of the Grasslands' resources. This plan emphasizes wildlife habitat, directing the Forest Service to "[a]lter grazing systems,

---

more concise document than an EIS but must provide sufficient evidence and analysis for determining whether an EIS must be prepared for the proposed action, or whether the proposed action will have no significant impact on the environment (finding of no significant impact, or FONSI). 40 C.F.R. § 1508.9(a). The EA must include discussions of the alternatives as required by 42 U.S.C. § 4332(2)(E). 40 C.F.R. § 1508.9(b).

season of use, and stocking levels to enhance wildlife habitat." It also requires the Forest Service to have developed residual cover[4] guidelines for the sharp-tailed grouse and greater prairie chicken "by [the] close of FY 1988." In 1985–prior to having considered all resource factors, seeking involvement of all interested parties, or conducting the requisite NEPA analysis–the Forest Service authorized the issuance of permits to graze cattle on the Grasslands at a maximum stocking rate of 70,436 Animal Unit Months (AUMs).[5] Documentation incorporated into the Grazing District's grazing agreement indicated that proper range condition analyses needed to be conducted, that when residual cover requirements were established, the permits would be subject to them, and that as monitoring and evaluation were conducted, the stocking levels could be revised.

After extensively studying[6] the impact of grazing on the wildlife habitat, the Forest Service ultimately determined that the 1985 stocking level made it impossible to satisfy the Nebraska Forest Plan's requirements for "long-term rangeland health and productivity, wildlife habitat, woody draw habitat, and soil and water protection." Therefore, in accordance with the NFMA and NEPA, the Forest Service prepared an

---

[4]"Residual cover" refers to the height and density of residual vegetation when measured in the fall after the grazing season has ended.

[5]An AUM is defined by the Natural Resources Conservation Service as a 1000 -pound cow with a calf less than six months old.

[6]Specifically, the Forest Service collected data that:

include[d], but [was] not limited to, range analysis using the Natural Resource Conservation Service . . . methodology, woody draw/riparian condition data, utilization measurements, and visual obstruction readings with the Robel pole to determine vegetation height and density. From 1985 through 1997, many monitoring techniques were used to monitor resource conditions on the [Grasslands] and specifically the effectiveness of the Interim Guidelines . . . .

Environmental Assessment in which it considered maximum grazing levels of 55,440[7] (an alternative considered at the request of the Grazing District), 45,211, 15,070, and 51,558 AUMs, along with a no-grazing alternative. In 1998, after giving public notice and receiving comments, the Forest Service issued a decision notice establishing the total maximum stocking level for the Grasslands at 51,558 AUMs and made a finding of no significant impact for the selected level.

The Grazing District subsequently filed a complaint seeking judicial review of this agency action. Both the Grazing District and Forest Service filed simultaneous motions for summary judgment. The district court granted summary judgment in favor of the Forest Service.

## II.    AGENCY ACTION

We review a district court's summary judgment decision de novo, applying the same standards as those applied by the district court. Friends of the Boundary Waters Wilderness v. Dombeck, 164 F.3d 1115, 1121 (8th Cir. 1999). When reviewing agency action intended by Congress to carry the force of law, we accord substantial deference to the agency's interpretation of the statutes and regulations it administers. Compare id. with United States v. Mead Corp., 121 S. Ct. 2164, 2172-76 (2001) (distinguishing degrees of deference to agency action pursuant to Chevron U.S.A. Inc. v. Natural Res. Defense Council, Inc., 467 U.S. 837 (1984), and Skidmore v. Swift & Co., 323 U.S. 134 (1944), based on whether Congress intended to delegate authority to regulate with the force of law), and Friends of Richards-Gebaur Airport v. FAA, 251 F.3d 1178, 1186 (8th Cir. 2001) (indicating that agency rulings not reached as the result of adjudicatory adversary proceedings or formal rule making are not entitled to Chevron-type deference but are "nevertheless accorded respect by the courts to the extent [they have] the power to persuade"). Here, it is apparent that

---

[7]This amounts to 57,232 AUMs with improved management.

Congress intended that public land be managed with the force of law, see, e.g., 16 U.S.C. § 1604 (providing intricate detail for land management process, including, notably, public participation).  Following statutory and regulatory guidance, the Forest Service amended the grazing plan through the public comment process.

Although NEPA does not authorize a private right of action, the Administrative Procedure Act (APA) provides for judicial review of agency action.  Sierra Club v. Slater, 120 F.3d 623, 630-31 (6th Cir. 1997).  Under the APA scheme, we must uphold agency action unless it was "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'"  Richards-Gebaur, 251 F.3d at 1185 (quoting 5 U.S.C. § 706(2)(A)).

A decision is arbitrary and capricious if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). Yet, "[w]hen the resolution of the dispute involves primarily issues of fact and analysis of the relevant information 'requires a high level of technical expertise, we must defer to the informed discretion of the responsible federal agencies.'"  Dombeck, 164 F.3d at 1128 (quoting Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 377 (1989).  The scope of our review is narrow and we are not to substitute our judgment for that of the agency.  Motor Vehicle Mfrs., 463 U.S. at 43.

We therefore accord appropriate deference to the agency's action under both Acts.  Because the Grazing District does not indicate that additional evidence is

necessary to resolve its claims, we will consider them on their merits and not remand to the district court.[8]  See Dombeck, 164 F.3d at 1127.

## A.    The National Environmental Policy Act

### 1.    Standing

As a threshold issue, the Forest Service contends that the Grazing District lacks standing to pursue its NEPA claim.  The issue of standing implicates constitutional limitations on federal court jurisdiction and prudential limitations on the exercise thereof.  Bennett v. Spear, 520 U.S. 154, 162 (1997).  Prudential standing is ascertained according to the zone-of-interests test, that is "'whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'"  Id. at 175 (quoting Association of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153 (1970)).  Article III standing is assessed based on a multi-part test, which, for associations, includes the issue of whether the interests at stake are germane to the organization's purpose.  Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000).  Here, the Grazing District's unavailing efforts to demonstrate that it has prudential standing reveal that it also lacks Article III standing.  See id. at 181.

---

[8]We reject the Grazing District's contention that we are required to remand the matter based on Florida Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985).  There, the Court indicated that if the record does not support the agency's action or allow the reviewing court to evaluate the challenged action, or if the agency failed to consider all relevant factors, then the proper course would typically be to remand to the agency for additional investigation or explanation.  Id.  Here, we need not look to Florida Power & Light because those precipitating factors are not present.

The Forest Service reasons that "[b]ecause the Grazing District has suffered only economic injury," it has no standing under NEPA. The Forest Service's logic makes a good deal of sense in light of NEPA's overall purpose of establishing "a broad national commitment to protecting and promoting environmental quality," Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 348 (1989), including "promot[ing] efforts which will prevent or eliminate damage to the environment and biosphere," 42 U.S.C. § 4321. Nevertheless, NEPA standing jurisprudence requires us to closely scrutinize the asserted basis for standing. See, e.g., Sierra Club v. Morton, 405 U.S. 727 (1972); Hawaii County Green Party v. Clinton, 124 F. Supp. 2d 1173 (2000).

Economic interests alone are "clearly not within the zone of interests to be protected by [NEPA]." Churchill Truck Lines, Inc. v. United States, 533 F.2d 411, 416 (8th Cir. 1976); accord, e.g., Western Radio Servs. Co., Inc. v. Espy, 79 F.3d 896, 903 (9th Cir. 1996). However, even though NEPA's procedures are not implicated unless a plaintiff has an environmental injury at stake, once those procedures have been invoked, a plaintiff can assert an injury arising from the agency's failure to consider NEPA's particular purposes or provisions, which might include economic considerations. Dombeck, 164 F.3d at 1127. Still, whether a plaintiff's interest is arguably protected by a statute under the zone-of-interests test for prudential standing is determined by reference to the particular provision of law upon which the plaintiff relies, and not by reference to the overall purpose of the act in question. Bennett, 520 U.S. at 175-76.

Here, the Grazing District argues that 42 U.S.C. §§ 4332(2)(C) and 4331(a), along with Dombeck, provide for protection of economic interests. The Grazing District ignores that in this matter, the Forest Service issued a FONSI and therefore no EIS was prepared, which is of central import to section 4332(2)(C) and to Dombeck, 164 F.3d at 1125 (stating that the "particular provisions relied on by the [plaintiffs] indicate that the social and economic effects of proposed agency action

must also be considered once it is determined that the proposed agency action significantly affects the physical environment").  Cf. Robinson v. Knebel, 550 F.2d 422, 424-25 (8th Cir. 1977) (distinguishing Churchill based on the fact that, in that case, the agency had not filed an EIS, and thereby finding prudential standing where a plaintiff's "environmental concerns [were] not so insignificant that they ought to be disregarded altogether").  Also, like section 4321, section 4331(a), which addresses maintaining "conditions under which man and nature can exist in productive harmony," is a broad policy statement.  Regardless of that overall broad policy, we must look to the specific provision under which the Grazing District raised its NEPA claim.  Bennett, 520 U.S. at 175-76.

The Grazing District relies on a NEPA provision that requires all federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  42 U.S.C. § 4332(2)(E).  This provision requires agencies to consider alternatives to proposals where an EIS is not required, but unlike considerations within an EIS, does not specifically consider the human environment.  Compare id. with 42 U.S.C. § 4332(2)(C) (requiring EIS that includes detailed statement on "alternatives to the proposed action" on "major Federal actions significantly affecting the quality of the human environment"), and 40 C.F.R. § 1508.14 ("*Human environment* shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment.  This means that economic or social effects are not intended by themselves to require preparation of an environmental impact statement.  When an environmental impact statement is prepared and economic or social and natural or physical environmental effects are interrelated, then the environmental impact statement will discuss all of these effects on the human environment.") (citation omitted).

Based on the statutory structure and language, the manifest purpose of section 4332(2)(E) is to require federal agencies to consider environmentally sound alternatives to proposed actions without reference to the human environment and, thus, to economic interests. This impels us back to the position highlighted in Churchill, which is that an economic injury is an insufficient basis for prudential standing within the meaning of NEPA. 533 F.2d at 416. Consequently, if its interests are only economic, the Grazing District is not within the zone of interests of the provision under which it has asserted its claim and thereby lacks prudential standing.

Acknowledging that an economic interest was an insufficient basis for standing, to find a requisite environmental interest, the district court relied on the Grazing District's complaint, which asserts that "evaluation of the management indicator species population trend data demonstrated that wildlife habitat was sustained under the stocking rate authorized by the Grazing Agreement." However, for an association to have Article III standing to bring suit on behalf of its members, "the interests at stake must be germane to the organization's purpose." Friends of the Earth, 528 U.S. at 181. The Grazing District is a corporation of individual ranchers organized to cooperatively operate and manage grazing lands. We find no indication that the Grazing District has any interest in protecting the wildlife habitat within the Grasslands. Moreover, the Grazing District fails to show that the Forest Service's action will cause environmental injury to itself or its members. See id. Consequently, the Grazing District lacks Article III standing to pursue its NEPA claim.

## 2. Reasonable Alternatives

Even if we were to assume the Grazing District's requisite standing, its NEPA claim still fails. The Grazing District argues that the Forest Service violated NEPA by failing to consider or evaluate alternatives that permitted stocking rates over 55,440 AUMs. We reject this contention.

As we indicate above, the Forest Service found that the chosen stocking level would have no significant impact on the environment.[9] When an agency has concluded through an Environmental Assessment that a proposed project will have a minimal environmental effect, the range of alternatives it must consider to satisfy NEPA is diminished. Missouri Mining, Inc. v. ICC, 33 F.3d 980, 984 (8th Cir. 1994). An agency's latitude in this vein is not, however, unbounded. Yet, to prevail on its claim, the Grazing District must demonstrate that its preferred stocking level is within the range of alternatives that reasonably needed to be considered. Id. It has failed to do so.

An agency need not consider all policy alternatives in its decision-making, Motor Vehicle Mfrs., 463 U.S. at 51. Nor must an agency pursue policy alternatives that are contrary to the pertinent statutory goals, Dombeck, 164 F.3d at 1129, or do not fulfill a project's purpose, City of Richfield v. FAA, 152 F.3d 905, 907 (8th Cir. 1998). Accord Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190, 195 (D.C. Cir. 1991) (indicating a proposed alternative is reasonable "only if it will bring about the ends of the federal action"). In contrast to a policy alternative generally, an "alternative within the ambit of [an] existing [s]tandard" may not be abandoned

---

[9]The Grazing District may not have been pleased had the agency found otherwise, for the finding of no significant impact might have cut in the Grazing District's favor. See, e.g., Duncan Energy Co. v. United States Forest Service, 50 F.3d 584, 585-86 (8th Cir. 1995) (mineral rights owner and developer seeking to avoid site-specific EIS); Sierra Club v. Marsh, 872 F.2d 497, 498-99 (1st Cir. 1989) (environmental group prevailing when EIS did not adequately respond to its comments). The agency's chosen course allowed it to permit a stocking level that it found would not significantly impact the environment, while, had the agency chosen a level that would bear a significant environmental impact, its more demanding proceedings could have ultimately yielded yet a lower level. Had the Grazing District viewed the agency's approach contrary to its interests, it should have challenged the agency's decision to pursue an environmental assessment in lieu of an EIS. See Missouri Mining, Inc. v. ICC, 33 F.3d 980, 982-84 (8th Cir. 1994).

without any consideration whatsoever. Motor Vehicle Mfrs., 463 U.S. at 51. Still, an agency may revoke a standard if it reasonably explains the available evidence and offers a rational connection between that evidence and its choice. Id. at 51-52. When an agency has considered relevant evidence and arrived at a rational result, a party's mere dissatisfaction with the agency's decision does not entitle it to relief. Von Eye v. United States, 92 F.3d 681, 685 (8th Cir. 1996).

The Grazing District's argument that the EA "acknowledged that grazing at the 70,436 AUM level had achieved USDA's habitat goals for sharp-tailed grouse," is a somewhat generous reading favoring its position. Again, the 70,436 AUM stocking level was only temporarily authorized when the Nebraska Forest Plan had not been subjected to the requisite NEPA or scientific range analysis. Since 1989, the actual stocking rate had not risen above 52,400 AUMs, and the Forest Service's acknowledgment rested on its assessment of the *average* habitat suitability between 1986 and 1997. More importantly, as the Forest Service explained in its EA, nesting cover under the most favorable conditions barely satisfied the habitat goals when the actual stocking level was below 52,800 AUMs, and, therefore, as we see it, that level was an impetus for modification of the permitted stocking level. In addition, the Grazing District has failed to demonstrate that its preferred level is "environmentally superior" to that chosen by the agency. See Missouri Mining, 33 F.3d at 984.

The amended stocking level is not an abandonment of an alternative within an existing standard. Cf. Motor Vehicle Mfrs., 463 U.S. at 51. Even if we were to assume that the amended stocking level represented some revocation of a prior standard–which we do not find to be the case since the prior level was merely temporary and had not been closely analyzed–"'the mere fact that an agency interpretation contradicts a prior agency position is not fatal,' unless the new position is a sudden and unexpected change in agency policy that can be characterized as arbitrary, capricious, or an abuse of discretion." Dombeck, 164 F.3d at 1123 (quoting Smiley v. Citibank (South Dakota), N.A., 517 U.S. 735, 742 (1996)).

-12-

Here, a Range Allotment Management Plan, which was incorporated into the Nebraska Forest Plan, indicated the stocking level was subject to change when appropriate guidelines were adopted and if monitoring and evaluation called for modification. Pertinent regulations also made it clear that the grazing permits were subject to modification. 36 C.F.R. § 222.4(a)(7) & (8). The Forest Service did not abuse its discretion when it did what the plans signaled it might do. Moreover, by virtue of the Forest Service's determination that a stocking level of 57,232 AUMs (or 55,440 initial AUMs) would not consistently satisfy the desired end, it *has* deliberatively rejected levels exceeding that amount. It stands to reason that if a stocking level of 57,232 AUMs would only achieve 25-35% of potential habitat suitability, then higher levels would not allow the government to achieve its goal of 40%.

## B. Reliability of Methodology

The Grazing District also attacks the methodology the Forest Service employed to assess habitat suitability, which underpins the choice of stocking levels. The Grazing District's arguments are inspired, but unavailing.

If the administrative record contains evidence that supports the positions of both the agency and the party seeking relief, the agency is entitled to rely on its experts' tests and observations, and decisions made in such reliance are not arbitrary and capricious. Downer v. United States, 97 F.3d 999, 1004 (8th Cir. 1996). Even if the agency's data is flawed, if the agency has relied on a number of findings and only some are erroneous, we must reverse and remand only if "'there is a significant chance that but for the errors the agency might have reached a different result.'" Dombeck, 164 F.3d at 1129 (citation omitted). The question for us "is not whether there might have been a better way for the agency to resolve the conflicting issues with which it was faced, but whether the agency's choice is a reasonable one." Southwestern Bell Tel. Co. v. FCC, 153 F.3d 523, 535 (8th Cir. 1998).

## 1.    Habitat Suitability Index

The Grazing District argues that the Forest Service's habitat suitability index was such an unreliable measure of sharp-tailed grouse nesting habitat that it rendered decisions stemming therefrom arbitrary and capricious.  The index compares levels of residual cover that remained after grazing with levels of cover in ungrazed areas in order to assess whether habitat for management indicator species, such as the sharp-tailed grouse, achieved at least 40% of potential.  The Grazing District contends that the index "did not establish a verifiable correlation between two measurable and quantifiable criteria," because "[w]hile visual obscurity can be quantified through direct measurement, habitat suitability can not [sic]," and that the Forest Service "did not use similar data to set the end points of its graph of the assumed relationship between visual obscurity and habitat suitability for sharp-tailed grouse on the [Grasslands]."

These concerns stem from the Grazing District's underlying assumption that the Forest Service should have included the effect of visual obscurity on sharp-tailed grouse populations in its index.  However, the Grazing District misapprehends the index, which was designed to assess the effect of grazing on the level of residual cover, not on the grouse population.  The Forest Service obtained from other sources data regarding what constitutes habitat suitability and need not have included in chart-form what it knew from its other sources to be the case.  For instance,

> Plains sharptail nesting cover tends to be more grassy and less shrubby than that of the prairie sharptail of the Great Lakes States.  The lack of good quality nesting and brood-rearing cover generally is limiting for sharp-tailed grouse throughout their range.  Plains sharp-tailed grouse are generally limited by intensive grazing and conversion of rangeland to cropland.  Grazing reduces the quantity of residual vegetation.  Residual herbaceous vegetation is important nesting cover because little

-14-

current growth is available in early spring when most nests are constructed.

Bart L. Prose, Habitat Suitability Index Models: Plains Sharp-Tailed Grouse, U.S. Fish Wildl. Serv. Biol. Rep. 82(10.142), 9, (1987) (citing various authorities).[10]

Similarly problematic is the Grazing District's argument that the data used to set the end points of the Forest Service's graph renders its decision arbitrary and capricious. Again, the graph was looking at the relationship between grazing and nesting cover. Basic statistics allows one to ascertain the relationship, or lack thereof, between any two variables. Although such relationships may be spurious, here the Grazing District fails to show that to be the case. Its suggestion that precipitation levels account more for optimal nesting cuts both ways, as precipitation would also affect the height and density of cover. The very report to which the Grazing District directs us undermines the Grazing District's point. Leslie A. Rice & Arthur V. Carter, Evaluation of South Dakota Grassland Management Practices As They Affect Prairie Chicken Populations, 1974-78, Dep't of Game, Fish and Parks Completion Rep. No. 84-11, 11 (1982) ("Amounts of moisture received before and during growing season also influenced amounts of forage left ungrazed which was measured the following spring."). The Grazing District also ignores predation concerns. Although the Grazing District emphasizes the number of nest-broods found in pastures subjected to various grazing methods, the study was inconclusive regarding nest fate. See id. at 13, 15 (indicating that the sample size may have caused a finding of no significant difference in nest fate when different grazing systems were compared).

---

[10]Also, a 1988 study concluded that, "[f]or safe nesting, numerous clumps of similar, suitable vegetation must exist so that predators can not [sic] narrow their nest search. Hens need to be lost in a sea of potential nest sites to avoid predation." Other data demonstrated that high average residual cover is necessary for sufficient numbers of clumps of high, dense grass, and that as the visual obscurity reading increased, the number of clumps of cover increased.

Furthermore, the Grazing District ignores the Forest Service's charge to protect the Grasslands habitat for fauna other than the sharp-tailed grouse, along with flora and other resources. As the Environmental Assessment points out:

> Through visual observations, erosion and gullies were noticed due to a lack of vegetative cover and a lower range condition. If livestock continue to graze at this [initial] level, resource conditions will degrade. If intensive grazing continues during a prolonged drought, the vegetative composition will decrease to a lower level of condition and the overall rangeland health declines.

The Forest Service's habitat suitability index was not defective for the purpose it was used and does not undermine other data the Forest Service relied upon. Nor was the index the primary tool used in the Forest Service's decision-making, but was merely "one of many considerations . . . along with many other pieces of information, both biological and social." The Forest Service accounted for discrepancies to which the Grazing District directs us and was entitled to rely upon its experts and data even though there may have been some conflicting data. See Perkins v. Bergland, 608 F.2d 803, 807 (9th Cir. 1979) (cautioning trial courts to "refrain from entering [the] fray if it turns out that the [plaintiffs'] position would require a choice between experts"). That the sharp-tailed grouse *can* nest in more heavily grazed areas misses the point since the Forest Service seeks to improve the habitat overall. The index was a reasonable tool among others employed and does not render the chosen stocking level arbitrary and capricious.

### 2. One-Point-In-Time Inventory

Also unpersuasive is the Grazing District's assertion that the Forest Service's reliance on a "one-point-in-time" range vegetation inventory violated the National Forest Management Act and rendered its choice of stocking levels arbitrary and capricious. The NFMA's general criteria require that, in developing and maintaining

land management plans, the Forest Service use "a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences." 16 U.S.C. § 1604(b).

The Grazing District claims that "inherent inadequacies of one point in time inventories as measures of overall stocking levels have been recognized by the scientific community and in court," citing Hodel, 624 F. Supp. at 1061. However, Hodel did not indicate that all one-point-in-time inventories were categorically unreliable, but that, there, the data obtained from a one-point-in-time study "was not ultimately used . . . because it yielded inconsistent results." Id. Yet those inconsistencies were "due in part to an insufficient number of samples, errors in identifying plant species, and assumptions built into the model." Id. Furthermore, that conclusion was not reached by a court, but by the Bureau of Land Management, an agency to whose decision the trial court deferred. Id.

Here, the Grazing District reveals the flaw in its argument in its first sentence: "*As part of* the decision making process, [the Forest Service] relied on a 1988-89 range inventory of the [Grasslands]." (Emphasis added). The Forest Service's research and data were not, however, static. The 1988-89 range inventory was supplemented with data collected from monitoring resource conditions during the period from 1985 through 1997. The Forest Service also made adjustments in the inventory to account for improvements in range condition since the original range data had been collected, upgraded pasture ratings to account for improvements in overall range condition, and increased the stocking levels accordingly.

The Grazing District refers us to the testimony of Dr. Jim Johnson of South Dakota State University to make its point that the Forest Service failed to consider the "best available information" regarding the relationship between the Grasslands' condition to stocking levels. Dr. Johnson testified:

In order to perfectly tie range condition to stocking rates, we would also need grazing history, trend, and utilization data on a pasture by pasture basis. However, experiences of range scientists and producers in South Dakota strongly support the validity of using the Suggested Initial Stocking Guides as a good approximation of where stocking levels should be to improve range or maintain high range conditions.

Our standard for agency action is not one of perfection, but whether the agency acted arbitrarily and capriciously. We find that the Forest Service has not.

The Grazing District also contends that the NFMA, 16 U.S.C. § 1610, required the Forest Service "to use information available from third parties." The Forest Service argues that the Grazing District failed to raise this point in the administrative proceeding and is therefore precluded from doing so now. We need not consider arguments a party failed to raise before the agency. Downer , 97 F.3d 1005.

However, assuming that the issue was properly raised, we have likely addressed its argument in our analysis of the one-point-in-time issue. Section 1610 states that, in carrying out her land management duties, "the Secretary of Agriculture shall utilize information and data available from other Federal, State, and private organizations and shall avoid duplication and overlap of resource assessment and program planning efforts of other Federal agencies." Although this is likely an efficiency provision, the Forest Service did look to available data from other agencies and private organizations. The statute does not require the Forest Service to adhere to the letter of each datum, which, judging from the various reports in this matter, would likely be virtually impossible. Furthermore, judging from Dr. Johnson's testimony, it appears that the Forest Service did rely on the best *available* data. The Forest Service did not contravene section 1610.

## III.  CONCLUSION

For the reasons we have outlined, we affirm the district court's grant of summary judgment in favor of the Forest Service.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.